689 A.2d 730

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. LLOYD BURGESS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 29, 1996—Decided February 18, 1997.

Humphreys, J.A.D., filed dissenting opinion.

256

Before Judges PRESSLER, HUMPHREYS and WECKER.

*Susan L. Reisner,* Public Defender, attorney for appellant (*Michael C. Kazer,* Designated Counsel, on the brief).

*Peter Verniero,* Attorney General, attorney for respondent (*Nancy A. Hulett,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

In *State v. Alexander,* 136 *N.J.* 563, 643 *A.*2d 996 (1994), the New Jersey Supreme Court mandated definitional jury instructions in a prosecution under *N.J.S.A.* 2C:35–3, the drug-kingpin statute, which became effective July 1987. The issue before us is whether the rule articulated by *Alexander* should be accorded retroactive effect in post-conviction relief proceedings that challenge a kingpin conviction which became final prior to *Alexander.* We conclude, under all the circumstances before us, that since those required instructions define elements of the kingpin offense, a kingpin conviction unsupported by a proper charge to the jury is vulnerable to attack on that ground by way of collateral review of a final judgment of conviction. We reach that conclusion irrespective of whether the usual standards for post-conviction relief alone apply or whether *Alexander* is deemed to constitute a "new rule," requiring a retroactivity analysis as well. Accordingly, we reverse the order appealed from denying the application of defendant

Lloyd Burgess for post-conviction relief on *Alexander* grounds and remand for a new trial.

Chronology is critical to our reasoning. Defendant Lloyd Burgess was convicted under the drug-kingpin statute prior to the decision of this court in *State v. Alexander,* 264 *N.J.Super.* 102, 624 *A.*2d 48 (App.Div.1993), affirmed by the Supreme Court the following year, 136 *N.J.* 563, 643 *A.*2d 996 (1994), in which we held that specified explanations of "upper echelon member" and "organized drug trafficking network" were essential in order to guide the jury's determination that "defendant's status and activities warranted the punishment which the Legislature has reserved for a 'leader of a narcotics trafficking network.' " *Alexander, supra,* 264 *N.J.Super.* at 111, 624 *A.*2d 48. Defendant Burgess's unsuccessful direct appeal, in which the issue of inadequate instructions was not raised, was also decided before this court's opinion in *Alexander.* Defendant's petition for certification was denied prior to the Supreme Court's *Alexander* opinion. *State v. Burgess,* 134 *N.J.* 566, 636 *A.*2d 523 (1993). In December 1994, following the Supreme Court's *Alexander* decision the previous July, defendant filed a petition for post-conviction relief raising, among other issues, the contention that the trial court's failure to give an *Alexander* charge deprived him of his constitutional due process right to a fair trial. The petition was dismissed, and defendant appeals.

For purposes of these post-conviction proceedings, the facts require only brief reference. The State produced evidence at trial that defendant was involved in a cocaine-trafficking scheme with at least four other persons. Two were street dealers, one assisted in breaking down larger quantities of cocaine into sales units and at times made purchases of cocaine for defendant in New York, and the fourth was defendant's girlfriend, who assisted in supplying the street dealers. All four, apparently addicts, received at least part of their payment in cocaine. Based on the foregoing evidence, the jury convicted defendant under the kingpin statute of conspiracy to distribute cocaine, and of twenty-four drug-

distribution and possession crimes. The remaining convictions were all merged into eight distribution convictions, two second-degree and six third-degree. Sentences of seven years on each of the second-degree convictions and of four years on each of the third-degree convictions were imposed, all to run concurrently with the life term.

With respect to the kingpin charge, the judge instructed the jury in the language of *N.J.S.A.* 2C:35–3, following the then model jury charge [1] and telling the jury that in order to convict under the statute, it had to find that defendant was "an organizer, supervisor, financier or manager" [2] in a drug-trafficking conspiracy and occupied "a high level position in the conspiracy." It was precisely the charge that we held in *Alexander* to be inadequate to sustain a kingpin conviction. That is to say, although we were satisfied that the kingpin statute is not facially void for vagueness, we nevertheless concluded that its application was subject to impermissible overbreadth absent the qualifications and explanations set forth in *N.J.S.A.* 2C:35–1.1c which, we held, define the status and conduct intended by the Legislature to be subject to kingpin punishment. Accordingly, we prescribed specific and discrete definitions of "a leader of a narcotics trafficking network" to convey to the jury the necessity of defendant's status as an "upper echelon member" of an organized "drug trafficking network" and to give the jury a better sense of the proscribed activity. *Alexander, supra,* 264 *N.J.Super.* at 110–111, 624 *A.2d* 48.

Following this court's *Alexander* opinion and while certification proceedings were pending on the State's petition in that case, the Supreme Court addressed the kingpin statute for the first time

---

[1] *New Jersey Model Jury Charges, Criminal, Leader of a Narcotics Trafficking Network, N.J.S.A.* 2C:35–3 (October 17, 1988).

[2] In response to a jury question, the judge specifically advised the jury that it could convict if it found defendant to have acted in any of these capacities in the conspiracy.

since its 1987 enactment in *State v. Afanador*, 134 *N.J.* 162, 631 *A.*2d 946 (1993). The sole issue the Court considered was the statute's asserted unconstitutional vagueness, both facially and as applied to defendant. A majority of four concluded that *N.J.S.A.* 2C:35–3 withstood that challenge. The three dissenters, for whom Justice O'Hern spoke, took a different approach. Recognizing the overbreadth problem, they were of the view that "the statute was applied unconstitutionally because it was applied too vaguely to guide the jury's function," a defect which, they concluded, could be cured by the discrete and specific "upper echelon" and "drug trafficking network" explanations prescribed by us in *Alexander*. *Afanador, supra*, 134 *N.J.* at 185, 631 *A.*2d 946 (O'Hern, J., dissenting). In sum, the dissent was persuaded that the content of the jury charge is inescapably linked to the constitutionality of the statute since only a properly limiting charge, and more particularly, the charge we mandated in *Alexander*, could save the statute from unconstitutional overbreadth. The response of the *Afanador* majority was simply to assert that the question of the jury charge was not before it, that the statute stood independently of the *Alexander* charge, and that it was inappropriate for the dissent to rely on an Appellate Division opinion while certification proceedings were still pending. 134 *N.J.* at 179, 631 *A.*2d 946.

A year later, on July 19, 1994, the Supreme Court decided *Alexander*, the majority now substantially adopting the views both of the Appellate Division and of the *Afanador* dissenters.[3] That is to say, the Court, now conceding the inherent ambiguity of *N.J.S.A.* 2C:35–3, concluded that

> [t]he prominence of the upper-level status of the defendant in the description and explanation of the purpose of the crime [as set forth in *N.J.S.A.* 2C:35–1.1c] clearly evidences the Legislature's intent that the status or the position of the defendant in the drug trafficking network is a substantive part of the crime.

> [*Alexander, supra*, 136 *N.J.* at 570, 643 *A.*2d 996.]

---

[3] Justice Handler, one of the *Afanador* dissenters, authored the *Alexander* majority opinion.

Accordingly, it held that "the status or position of the defendant should be considered a material element of the crime," requiring, in accordance with the legislative intent articulated by *N.J.S.A.* 2C:35–1.1c, albeit not expressly reiterated in *N.J.S.A.* 2C:35–3, inclusion of the definitional element of "the role of the defendant as an 'upper-level member' of a drug operation." *Alexander, supra,* 136 *N.J.* at 570–571, 643 *A.*2d 996. Rejecting to some extent the specificity of the definition prescribed by us in *Alexander,* the Supreme Court instructed as follows with respect to the requisite charge to the jury:

> Under the statute a drug-trafficking network need not have any specific configuration or chain of command. Such a network is not to be understood primarily or exclusively as a vertical, in contrast to a horizontal, organization. Rather, it is to be considered as an organization of persons who are collectively engaged in drug activities. A "high-level" or "upper-echelon" "leader" of such an organization is one who occupies a significant or important position in the organization and exercises substantial authority and control over its operations. Neither the specific elements enumerated in the provisions of *N.J.S.A.* 2C:35–3 nor the additional requirements extrapolated from the statute's statement of purpose indicate that a drug operator exercising authority and controlling other people in an organization or network, even at the street level, could not be a "leader" or "drug kingpin" within the contemplation of the Legislature. Rather, the role of a defendant as a leader or drug kingpin turns more on the nature of that person's authority, the magnitude or extent of control, and the number of persons over whom that power is exercised.
>
> An appropriate instruction should also amplify the other statutory terms that are expressed as material elements of the crime under *N.J.S.A.* 2C:35–3. Thus, the statutory terms "organizer, supervisor, financier or manager" should be explained so that the meaning of those terms is more fully understood by the jury. For example, the court might define an "organizer" as a person who arranges, devises, or plans a drug-trafficking network; a "supervisor" as one who oversees the operation of a drug-trafficking network; a "financier" as one who is responsible for providing the funds or resources necessary to operate a drug-trafficking network; and a "manager" as one who directs the operations of a drug-trafficking network.
>
> [*Id.* at 575, 643 *A.*2d 996.]

A conforming revised model jury charge was adopted on February 26, 1996. *See New Jersey Model Jury Charges, Criminal, Leader of Drug Trafficking Network, N.J.S.A.* 2C:35–3 (February 26, 1996).

Defendant, of course, did not have the benefit at trial of that "upper-echelon" or "high-level" instruction. The question now is whether that omission is subject, both procedurally and substantively, to collateral attack by way of a petition for post-conviction relief entitling defendant to a new trial.

To begin with, we reject the State's contention that the petition is procedurally precluded under *R.* 3:22–4, which bars assertion by way of post-conviction petition of a ground for relief not raised on direct appeal or in a prior petition. The rule relieves defendant from that bar if "denial of relief would be contrary to the Constitution of the United States or the State of New Jersey." *R.* 3:22–4(c). As we held in *State v. Cupe,* 289 *N.J.Super.* 1, 8, 672 *A.*2d 1233 (App.Div.), *certif. denied,* 144 *N.J.* 589, 677 *A.*2d 761 (1996), a "genuinely alleged serious defect in the jury charges will circumvent the procedural prohibition." Clearly, such a defect implicates a claim of constitutional dimension and, just as clearly, this is such a case.

It is, of course, well settled that "correct jury instructions are at the heart of the proper execution of the jury function" and are essential for a fair trial. *Alexander, supra,* 136 *N.J.* at 571, 643 *A.*2d 996. *See also State v. Brown,* 138 *N.J.* 481, 522, 651 *A.*2d 19 (1994); *State v. Martini,* 131 *N.J.* 176, 271, 619 *A.*2d 1208 (1993); *State v. Clausell,* 121 *N.J.* 298, 318–319, 580 *A.*2d 221 (1990); *State v. Collier,* 90 *N.J.* 117, 122, 447 *A.*2d 168 (1982) (*quoting State v. Green,* 86 *N.J.* 281, 287, 430 *A.*2d 914 (1981)). It is also clear that a charge which fails properly to define the substantive elements of the offense is ordinarily fatal to the ensuing conviction. *State v. Rhett,* 127 *N.J.* 3, 7, 601 *A.*2d 689 (1992); *State v. Weeks,* 107 *N.J.* 396, 410, 526 *A.*2d 1077 (1987). There is, therefore, no doubt that had this trial taken place after the Supreme Court's decision in *Alexander,* the omission of the prescribed charge would have constituted plain error cognizable on appeal and requiring a new trial. *See Brown, supra; Clausell, supra; State v. Martin,* 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990); *State v. Harmon,* 104 *N.J.* 189, 213, 516 *A.*2d 1047 (1986); *State v.*

*Simon,* 79 *N.J.* 191, 206, 398 *A.2d* 861 (1979); *State v. Hock,* 54 *N.J.* 526, 538, 257 *A.2d* 699 (1969), *cert. denied,* 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970). The issue is whether the rules of retroactivity preclude this defendant, who challenges the omission on post-conviction petition, from being accorded the same remedy. We are persuaded that they do not.

The retroactivity of judicial holdings affecting the conduct of criminal trials is a complex issue implicating significant but competing jurisprudential doctrines which can, in the main, be summarized as the interest in fundamental fairness on the one hand and the interest in finality on the other. The weighing of the balance between them is, in actuality, primarily dependent on whether the retroactivity issue arises in the pre-finality stage of the criminal proceedings, that is, prior to the exhaustion of direct review, or whether it arises thereafter by way of collateral attack in a post-conviction proceeding. The subject, in our view, is rendered even more complex by the apparent divergence of retroactivity jurisprudence between the federal courts, in which direct versus collateral attack is the bright-line determinant of retroactivity, and the New Jersey courts, which have not expressly acknowledged the doctrinal implications of that distinction.

Some historical reference is necessary. An instructive starting point in understanding the United States Supreme Court's modern retroactivity jurisprudence is *Linkletter v. Walker,* 381 *U.S.* 618, 85 *S.Ct.* 1731, 14 *L.Ed.*2d 601 (1965), in which the Court denied collateral-attack retroactivity to the exclusionary rule of *Mapp v. Ohio,* 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.*2d 1081 (1961), essentially on the ground that the inevitable and obvious burdens on the judicial process that would ensue from a post-finality retroactivity holding were not outweighed by the fundamental purpose of the *Mapp* rule. *Linkletter* was followed several years later by *Stovall v. Denno,* 388 *U.S.* 293, 87 *S.Ct.* 1967, 18 *L.Ed.*2d 1199 (1967), involving, also in the context of collateral attack, the retroactivity of the defendant-identification rules enunciated by *United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967). It

was in *Stovall* that the Court, relying on *Linkletter* and its intervening decision in *Johnson v. New Jersey,* 384 *U.S.* 719, 86 *S.Ct.* 1772, 16 *L.Ed.*2d 882 (1966), articulated the three-prong test for determining retroactivity that dominated federal retroactivity jurisprudence for the next twenty years and still, apparently, dominates New Jersey's. The elements of that test were defined as.

> (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.
>
> [*Stovall, supra,* 388 *U.S.* at 297, 87 *S.Ct.* at 1970, 18 *L.Ed.*2d at 1203.]

The underlying rationale for this test, the Court explained, is the understanding that

> "[t]he retroactivity or nonretroactivity of a rule is not automatically determined by the provision of the Constitution on which the dictate is based. Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved."
>
> [*Ibid.* (quoting *Johnson, supra,* 384 *U.S.* at 728, 86 *S.Ct.* at 1778, 16 *L.Ed.*2d at 889).]

Of course, at least up to this point, the foundation predicate for the *Stovall* analysis required that the judicial holding that was the subject of the retroactivity analysis be a "new rule," that is, a rule generally described as one both unanticipated and constituting a clear break with the past. *See, e.g., United States v. Johnson,* 457 *U.S.* 537, 549–550, 102 *S.Ct.* 2579, 2586–2587, 73 *L.Ed.*2d 202, 213–214 (1982). We think it plain that if the judicial holding in question were not to qualify as a new rule, then retroactivity analysis would be irrelevant and the availability of the holding to a convicted defendant would be circumscribed, as in the case of any other omitted defense theory or argument, by other relevant doctrines including the plain-error rule and the customary standards for the grant of post-conviction relief.

The demise of the *Stovall* new-rule/three-prong test was foreshadowed by Justice Harlan's concurring and dissenting opinions in *Desist v. United States,* 394 *U.S.* 244, 256, 89 *S.Ct.* 1030, 1038, 22 *L.Ed.*2d 248, 259 (1969), and *Mackey v. United States,* 401 *U.S.*

667, 675, 91 *S.Ct.* 1160, 1171, 28 *L.Ed.*2d 404, 410 (1971) (Harlan, J., concurring in judgments and dissenting). Simply stated, in Justice Harlan's view the essentially *ad hoc* application of the *Stovall* test, not only in post-finality cases but also, as it had developed, in pre-finality cases as well, was jurisprudentially unsound on a number of grounds, primary among them being the denial of similar relief to defendants similarly situated. As he saw it, every announced rule of law, whether or not new in the *Stovall* context, should be available to every defendant whose conviction is not yet final in the sense of exhaustion of direct review. In his view, however, the interests of finality become paramount once the conviction has become final, and hence, on collateral attack, retroactivity should be accorded to a new rule only when the rule decriminalizes the conduct that was the basis of the conviction or where the new rule prescribes procedures that are "implicit in the concept of ordered liberty." *Mackey, supra,* 401 *U.S.* at 693, 91 *S.Ct.* at 1180, 28 *L.Ed.*2d at 421.

In *Griffith v. Kentucky,* 479 *U.S.* 314, 107 *S.Ct.* 708, 93 *L.Ed.*2d 649 (1987), the Supreme Court finally abandoned the *Linkletter–Johnson–Stovall* approach, expressly adopting the views of Justice Harlan as expressed in *Desist* and *Mackey. Griffith* drew a clear and dramatic distinction between direct review and collateral attack and recognized that in direct-review cases, the "selective application of new rules" that had resulted from the *Stovall* approach "violates the principle of treating similarly situated defendants the same." *Griffith, supra,* 479 *U.S.* at 323, 107 *S.Ct.* at 713, 93 *L.Ed.*2d at 658. *Griffith* accordingly held that

a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past. [*Id.,* 479 *U.S.* at 328, 107 *S.Ct.* at 716, 93 *L.Ed.*2d at 661.]

Of significance, too, is *Griffith*'s further observation that while the *Stovall* three-prong test no longer applied for purposes of direct-review retroactivity analysis, nevertheless, the second and third prongs, namely, reliance by law enforcement officials and the burden on the administration of justice, continued to be useful in

the post-finality context. 479 *U.S.* at 326–327, 107 *S.Ct.* at 715, 93 *L.Ed.*2d at 661.

For present purposes, we conclude the federal story with *Teague v. Lane,* 489 *U.S.* 288, 109 *S.Ct.* 1060, 103 *L.Ed.*2d 334 (1989). Reemphasizing the direct-review rule of *Griffith,* the Court expressly adopted Justice Harlan's statement of standards for according retroactivity on collateral attack, making clear that in that context, the threshold inquiries are first, determination of the date of finality of the conviction and then determination of whether the announced rule was new in the "clear break" sense.

That brings us to New Jersey's retroactivity jurisprudence. Prior to *Griffith,* the New Jersey Supreme Court followed *Linkletter–Johnson–Stovall,* reserving to itself the power to determine the extent of retroactivity of a new rule of law, applying the three-prong test, and not distinguishing, in a dispositive way, between direct review and collateral attack. *See, e.g., State v. Burstein,* 85 *N.J.* 394, 427 *A.*2d 525 (1981); *State v. Howery,* 80 *N.J.* 563, 404 *A.*2d 632, *cert. denied,* 444 *U.S.* 994, 100 *S.Ct.* 527, 62 *L.Ed.*2d 424 (1979); *State v. Nash,* 64 *N.J.* 464, 317 *A.*2d 689 (1974). The Court's first post-*Griffith* address of retroactivity came in *State v. Lark,* 117 *N.J.* 331, 567 *A.*2d 197 (1989), a post-conviction relief case in which the issue was the retroactivity of *State v. Howard,* 110 *N.J.* 113, 539 *A.*2d 1203 (1988), where the Court had held that prior to accepting a guilty plea from a sex-offender, the trial judge must advise him of the parole consequences of a sentence to the Adult Diagnostic and Treatment Center at Avenel. The Court rejected retroactivity, applying the traditional three-prong test without explicitly considering its intervening abandonment by *Griffith–Teague* or the analytic rationale and policy bases underlying that abandonment.[4] Nor did *Lark* draw a bright-line distinction between direct review and collateral attack. Nevertheless, it is clear that without expressly having done so, the analysis of *Lark*

---

[4] We raise, but do not address, the question of whether, to the extent *Griffith* rests upon an equal-protection foundation, the *Griffith* rule itself is one of constitutional magnitude requiring compliance by the states.

closely tracked the *Griffith dictum* that the second and third *Stovall* factors remained relevant in deciding collateral-attack retroactivity questions. Indeed, it was based on those factors that *Lark* denied that retroactivity. Thus, the Court noted that there were 486 potentially affected Avenel inmates and 142 more awaiting admission, that retroactivity would result in several hundred petitions of post-conviction relief, that the pre-*Howard* practice was of long standing, and that the potentially disruptive effect of retroactivity was not outweighed by any other consideration. *Lark, supra,* 117 *N.J.* at 341, 567 *A.*2d 197.

Retroactivity was again addressed in *State v. Harvey,* 121 *N.J.* 407, 581 *A.*2d 483 (1990), a capital murder case before the Court on direct appeal in which the retroactivity question involved the holding in *State v. Hartley,* 103 *N.J.* 252, 511 *A.*2d 80 (1986), rendered after the conclusion of defendant's trial and requiring that where a suspect has previously invoked his right to remain silent, fresh *Miranda*[5] warnings must be given before interrogation is resumed. The Court accorded *Hartley* retroactivity on two grounds. It concluded first that it did not announce a new rule and hence retroactivity was not an issue. It also concluded that retroactivity was required both under *Stovall* and under *Griffith.* Its *Griffith* discussion was, however, not in terms of whether New Jersey should choose to follow that rule, but rather whether New Jersey was obliged to follow it if the subject of the "new" holding involved a federal constitutional issue.

Most recently, the Court considered retroactivity in *State v. Knight,* 145 *N.J.* 233, 678 *A.*2d 642 (1996), another direct-review case in which the holding in *State v. Sanchez,* 129 *N.J.* 261, 609 *A.*2d 400 (1992)—again a *Miranda* pronouncement coming after defendant's trial—was in issue. Once more, the Court, without drawing a defining distinction between direct review and collateral attack, applied the three-prong test. Although noting *Griffith*'s

---

[5] *Miranda v. Arizona,* 384 *U.S.* 436, 478–479, 86 *S.Ct.* 1602, 1630, 16 *L.Ed.*2d 694, 726 (1966).

rejection thereof, it again did not address the policy or rationale of the *Griffith* holding or of the Harlan dissents on which both *Griffith* and *Teague* were based. Nevertheless, retroactivity was accorded based on the *Stovall* test.

We find it significant that although the Court continues to apply *Stovall*, it reached the same result in these three cases that *Griffith–Teague* would have required—namely, the according of retroactivity in the two direct-review cases and the withholding of retroactivity in the collateral-attack case.

We have belabored this parallel federal and state doctrinal development because of its instructiveness in our address of a post-conviction relief retroactivity problem. That is to say, we are satisfied that the *Stovall* three-prong test remains fully applicable to post-finality situations even if there were any question of its continued validity in direct-review cases, and we are satisfied that that test has been met here. We are also satisfied that the even more restrictive *Teague* test, the other side of the *Griffith* coin, which places a paramount value on the importance of finality, is met as well in the circumstances before us.

We address first the new-rule issue, which, although no longer relevant under *Griffith*, is of critical importance in the post-conviction situation under both *Stovall* and *Teague*. It is, of course, clear that when the new-rule question is relevant, it is the threshold question in retroactivity analysis. *See, e.g., Harvey, supra,* 121 *N.J.* at 421, 581 *A.2d* 483; *Lark, supra,* 117 *N.J.* at 335, 567 *A.2d* 197; *State v. Cupe, supra,* 289 *N.J.Super.* at 11, 672 *A.2d* 1233. It is our view that *Alexander* did not announce a new rule of law, certainly not in the sense of "a sudden and generally unanticipated repudiation of a long-standing practice." *Cupe, supra.*[6] The fact of the matter is that there was *no* law respecting

---

[6] The issue in *Cupe* was the retroactivity of the Court's bar in *State v. Coyle,* 119 *N.J.* 194, 574 *A.2d* 951 (1990), of a sequential charge in a murder case where there is evidence of passion/provocation, *Cupe* noting the use of sequential

the elements of the required jury instructions in a drug-kingpin case prior to our 1993 decision in *Alexander*. No reported opinion had earlier addressed the matter. Moreover, the Supreme Court in *Afanador*, decided after our opinion in *Alexander*, expressly declined to consider the question of proper instructions. We are aware that there was a model jury charge, that is, the charge employed in defendant's trial that we held in *Alexander* to be incorrect. But it is difficult to see how that model jury charge can represent a long-standing practice. We recognize that although a model jury charge is entirely unofficial and does not have the weight of law,[7] it could, under appropriate circumstances, be said to evidence a long-standing practice. But that does not appear to be the case here. On February 1, 1990, the date on which the verdict was returned at defendant's trial, *N.J.S.A.* 2C:35-3 itself was less than three years old and the model jury charge considerably less than two. If a new rule of law can reasonably be said to constitute "a clear break with the past," *Lark, supra,* 117 *N.J.* at 338, 567 *A.*2d 197, then in order to be new, there must have been an appreciable past from which the rule departs. That, too, does not appear to be the case here. The statute in question, as observed by *Alexander, supra,* 136 *N.J.* at 568, 643 *A.*2d 996, is "unusually-constructed," its essential elements being elsewhere defined by implication. Because of its inherent ambiguity, the initial challenge was to its constitutionality as written. The intertwining of its constitutionality with the determination of a proper jury instruction was a matter of evolution, consuming a not inordinate time period from statutory enactment to definitive Supreme Court interpretation. The point, of course, is that it is a difficult task, if possible at all, to identify a discrete past within a period of evolution. If, of course, the *Alexander* holding is not a new rule for retroactivity purposes, then the only question before

---

charges for some time and its continued approbation in other jurisdictions. *Coyle* clearly was "new law."

[7] *See, e.g., State v. Bielkiewicz,* 267 *N.J.Super.* 520, 531 n. 2, 632 *A.*2d 277 (App.Div.1993).

us would be whether the absence of an *Alexander* instruction from the charge constituted plain error. We have no doubt that under this analysis, defendant would be entitled to a new trial because of the evident prejudice of the failure of the charge to define critical elements of the crime.

We are, however, satisfied that even if the *Alexander* charge were deemed to constitute a new rule for retroactivity purposes, it would, as we have said, be available to this defendant on collateral review under both *Stovall* and *Teague*. We address first the *Stovall* factors.

The first of these, namely the purpose of the new standard, is convincingly demonstrated here. We think it clear that there has been a shift of perception by the Court's majority between *Afanador* and *Alexander*. Whether or not *Alexander* can be construed as definitively linking the kingpin statute's constitutionality with the giving of a proper charge, it is at least plain that the Court now conceives of the properly defined "high-level" or "upper-echelon" status of the defendant as an essential element of the offense. We further read *Alexander* as holding that the legislative intent in enacting the kingpin statute cannot be assured of proper execution absent that element. The purpose of the *Alexander* charge then, in retroactivity terms, if not to correct a constitutional flaw in the statute, is at least to assure effectuation of the legislative intent of protecting society while at the same time protecting accused persons from being subject to inordinately harsh penalties not meant for them. In our view, any kingpin conviction, other than an irrefutably clear factual case of statutory applicability, is suspect absent the correct charge to the jury.

We are also satisfied that the second and third *Stovall* factors, namely law-enforcement reliance and burden on the administration of justice, are met here as well, no matter how broadly those factors are defined and how heavily they are weighted. That is to say, we fully recognize the great potential for inordinate burden on the criminal justice process if, after direct review has been completed—and in many cases, long after—convictions were per-

mitted to be overturned on a wholesale basis, and hundreds, if not thousands, of new trials were ordered at a time when evidence had been lost and witnesses who might still be available had long since forgotten the events in question. We reach the conclusion that these concerns are not implicated here on a purely statistical basis. Thus, the data provided to us by the Administrative Office of the Courts, Criminal Practice Division, show that between the date of the adoption of *N.J.S.A.* 2C:35–3 in 1987 and July 19, 1994, when *Alexander* was decided in the Supreme Court, there were altogether twenty-nine kingpin convictions, of which eighteen were based on guilty pleas and only eleven on jury verdicts. Three of those eleven convicted are Alexander, Afanador [8] and this defendant. Alexander has already been accorded a new trial. Thus, there is a maximum of ten new trials that could result from a post-conviction retroactivity holding here.[9] We are satisfied that as a matter of balancing, that burden thus imposed is not inordinate.

With respect to the reliance factor, we appreciate that if the original and defective model jury charge can be deemed the "old rule," there is likely to have been reliance on it in most if not all of the eleven trials. But the original model charge was not long-lived, there was no long-standing practice, and in the case of a statute as difficult to interpret and apply as this one, and as ambiguous and unusually constructed as *Alexander* recognized it to be, the model jury charge, in this instance, provided a less than sturdy basis for reliance.

If *Teague* were to govern, we are persuaded that the "ordered liberty" exception would apply. It is a foremost principle of our criminal jurisprudence that a person accused of a crime cannot be

---

[8] The Supreme Court has granted certification to review the Appellate Division's unpublished affirmance of the denial of *Afanador's* application for post-conviction relief. 147 *N.J.* 578, 688 *A.2d* 1053 (1997).

[9] We are also advised that the ten convictions, omitting *Alexander,* are fairly evenly spread among the counties. There was one each in Cumberland, Essex, Monmouth, Passaic, Somerset, and Union, and four in Mercer which, however, apparently involved a joint trial of at least some of the defendants.

validly convicted unless the State proves each element of the offense and the jury is instructed to find each element of the offense as correctly defined. Considering the magnitude of the mandatory penalty a conviction under the kingpin statute carries, we are persuaded that fundamental fairness and justice require full retroactivity.

There is one further matter we must address. If *Alexander* is accorded retroactivity, the question remains as to whether this defendant was prejudiced by the omission of the proper charge. That is to say, did the omission meet the standard of the plain-error rule? Our dissenting colleague thinks not because he views the evidence at trial as overwhelming in favor of guilt of the kingpin charge even as subsequently defined. We disagree. It is virtually axiomatic that erroneous instructions are poor candidates for rehabilitation by the mechanism of the plain-error rule. *See, e.g., State v. Wilson,* 128 *N.J.* 233, 241, 607 *A.*2d 1289 (1992); *State v. Vick,* 117 *N.J.* 288, 289, 566 *A.*2d 531 (1989). Moreover, we simply do not regard the evidence here as so clear as to have compelled a jury, if properly instructed as to the definitional elements of the offense, to return a guilty verdict. We are of the further view that where the penalty is so severe, it is inappropriate for the court to speculate on what a jury, properly instructed, would have done except in the clearest case. We do not regard this as such a case. We are rather satisfied that the governing principle here is that summarized by the Supreme Court in *State v. Schmidt,* 110 *N.J.* 258, 540 *A.*2d 1256 (1988):

> "At the heart of the guarantee of a fair trial [are] the 'jury's impartial deliberations upon the guilt of a criminal defendant based solely upon the evidence in accordance with proper and adequate instructions * * *.'" *State v. Collier,* 90 *N.J.* 117, 122 [447 *A.*2d 168] (1982) (quoting *State v. Simon,* 79 *N.J.* 191, 206 [398 *A.*2d 861] (1979)). It is "the nondelegable and nonremovable responsibility of the jury to decide" the question of guilt or innocence in accordance with those instructions. [*State v. Ingenito,* 87 *N.J.* 204, 211, 432 *A.*2d 912]. The " 'question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury* * *.'"
>
> [*Schmidt, supra,* 110 *N.J.* at 265, 540 *A.*2d 1256 (quoting *Bollenbach v. United States,* 326 *U.S.* 607, 614, 66 *S.Ct.* 402, 406, 90 *L.Ed.* 350, 355 (1946))].

See also *State v. Coyle,* 119 *N.J.* 194, 574 *A.*2d 951 (1990), in which the Supreme Court again made clear that where the elements of the crime are not correctly charged,[10] the defendant is entitled to a new trial if there is a sufficient basis for the jury to find in defendant's favor on that issue. As Justice Clifford explained, it is enough if that favorable finding is

> a permissible one ... [even if] not the exclusive one. Although a jury might not agree with defendant's argument, defendant was entitled to have the jury decide the issue. The test is "whether there is room for dispute." *State v. Mauricio,* 117 *N.J.* 402, 415, 568 *A.*2d 879 (1990) [full citation omitted].
>
> [*Coyle, supra,* 119 *N.J.* at 211, 574 *A.*2d 951.]

We are persuaded that if correctly charged, the jury here could have rationally decided that defendant was not guilty of the drug-kingpin charge.

In challenging the denial of post-conviction relief, defendant raises other issues as well. His argument that he was denied effective assistance by appellate counsel is mooted by our retroactivity finding. We find his claim of denial of effective assistance of counsel by reason of defendant's absence from the post-conviction hearing and his claim of prosecutorial vindictiveness to be without merit. *R.* 2:11–3(e)(2).

The order denying post-conviction relief is reversed, and we remand for a new trial on the kingpin charge alone.

HUMPHREYS, J.A.D., dissenting.

The Legislature declared in the Comprehensive Drug Reform Act of 1987, *N.J.S.A.* 2C:35–1 to –23, that the

> unlawful use, manufacture and distribution of controlled dangerous substances continues to pose a serious and pervasive threat to the health, safety and welfare of

---

[10] The issue in *Coyle* was whether the defendant was entitled to a charge in accordance with *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), that the jury must find in a capital murder case that the defendant purposefully or knowingly caused death, not merely purposefully or knowingly caused serious bodily injury resulting in death. The defendant in *Coyle* had shot his victim several times at close range with a nine-millimeter handgun. The Supreme Court held him entitled to a *Gerald* charge.

the citizens of this State. New Jersey continues to experience an unacceptably high rate of drug-related crime and continues to serve as a conduit for the illegal trafficking of drugs to and from other jurisdictions.

[*N.J.S.A.* 2C:35–1.1(b).]

The Legislature addressed this "serious and pervasive threat" by providing in the Act for severe penalties for leaders of narcotics trafficking networks, the so-called "drug kingpins." *N.J.S.A.* 2C:35–3. The defendant was charged as such a leader. The evidence at his trial overwhelmingly established that he was the leader of a street-level drug distribution network. He was convicted of this crime. His conviction was affirmed on appeal.

Now, almost seven years after the trial, his conviction is reversed because the judge's charge to the jury did not conform to the charge presently approved by the New Jersey Supreme Court. At the time it was given, the judge's charge conformed to existing and accepted legal practice. The charge was not challenged either at trial or on appeal. The failure to give the new charge does not impair the accuracy of the jury's verdict. No fundamental injustice is present. To reverse a criminal conviction under these circumstances conflicts with basic principles of criminal justice.

Additionally, the rationale of the majority decision has likely erased the convictions of virtually every drug kingpin convicted prior to the Supreme Court decision in *State v. Alexander,* 136 *N.J.* 563, 643 *A.2d* 996 (1994); *see also State v. Wright,* 143 *N.J.* 580, 675 *A.2d* 216 (1996). I do not agree that this wholesale reversal of otherwise valid criminal convictions is mandated by law. I respectfully dissent.

I

The statute defines a "leader of a narcotics trafficking network" as one who "conspires with others as an organizer, supervisor, financier or manager, to engage for profit in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State [certain controlled dangerous substances]." *N.J.S.A.* 2C:35–3.

In *State v. Afanador*, 134 *N.J.* 162, 631 *A.*2d 946 (1993), the Supreme Court held that the statute, while not a "model of precise draftsmanship," sufficiently "describes the conduct that it proscribes." *Id.* at 169, 631 *A.*2d 946. The Court said that a "person of average intelligence comprehends the meaning of the words 'organizer, supervisor, financier or manager'" and that the terms are therefore not facially vague. *Id.* at 171, 631 *A.*2d 946.

A leader of a narcotics trafficking network, the Court said, is a person who exercises "some supervisory power over others." *Id.* at 172, 631 *A.*2d 946. Accordingly, "[b]ecause street-level dealers ordinarily lack any supervisory power over their suppliers or buyers, the statute does not transform every dealer into a kingpin." *Id.* at 173, 631 *A.*2d 946. However, a drug kingpin need not necessarily be superior to street-level distributors and to their immediate supervisors or suppliers. *State v. Alexander, supra,* 136 *N.J.* at 574, 643 *A.*2d 996.

Further, a drug kingpin does not have to be the only or even the primary organizer, supervisor, financier or manager. *See Model Jury Charges*, Leader of a Drug Trafficking Network, *N.J.S.A.* 2C:35-3 (1996). A "high-level" or "upper-echelon" leader of a street-level organization is a drug kingpin if that person "occupies a significant or important position in the organization and exercises substantial authority and control over its operations." *State v. Alexander, supra,* 136 *N.J.* at 575, 643 A.2d 996. Thus, one can be a drug kingpin "even at the street-level." *Ibid.*

An examination of the evidence in this case demonstrates that Burgess squarely fits the category of a leader of a drug trafficking network and is not simply a street-level dealer. Burgess acted as an organizer, supervisor, financier and manager of a drug dealing operation which sold thousands of dollars of cocaine a week at the Lakewood Housing Project. One of his associates, Brown, sometimes would sell in one day several thousand dollars worth of cocaine. Burgess admitted to the police that he purchased cocaine in large units, such as two to two and one-half kilograms. One kilogram would cost as much as $17,500. The police calculated

that Burgess made over $13,000 in profit on each kilogram. On cross-examination, Burgess said he kept $12,800 in cash under a plant in his house for emergencies.

When a search warrant was executed at Burgess's house, the police found large amounts of cash and savings bonds totalling over $40,000 and a quantity of gold jewelry. The police also seized a 1987 Chevrolet IROC Camaro. Burgess admitted to the police that the money at home, the furniture and the car were the proceeds of his cocaine business. Burgess had been unemployed for eighteen months.

Burgess obtained an unnamed "Dominican" source of cocaine in New York. Burgess had the cocaine picked up in New York and brought back to New Jersey. Burgess then arranged for the street sales at the housing project. Burgess provided the money to buy the drugs and made a profit on the sales by the other drug dealers.

Burgess had five persons working for him: the co-defendants Brown and Martin, Burgess's girlfriend, Catalan, and two others, Williams and Dorsey. Brown told the police and later testified that he worked for and sold drugs for Burgess, and that Burgess supplied him with drugs to sell. He told customers including an undercover police officer that the drugs came from Burgess.

Catalan supplied Brown with cocaine as part of an arrangement with Burgess. Brown would pay Catalan two-thirds of the profits from the sale of a package of cocaine and Catalan would then give him another package to sell. Sometimes Martin instead of Catalan would supply Brown with cocaine to sell while collecting the profits for Burgess. After Martin was arrested, Burgess gave Williams $10,000 to post for Martin's bail. Burgess employed Dorsey as a "strong arm" man to beat up people who would not pay.

Williams told the police and later testified that preparation of the cocaine for distribution was done for Burgess. Under their arrangement, Burgess would bring several kilograms of cocaine to

Williams' home and Williams would break it down into small units for sale on the street. In return, Burgess would pay Williams by providing him with cocaine at a reduced price. Williams testified that the cocaine belonged to Burgess.

Williams also went to New York City to purchase cocaine for Burgess. Burgess would tell him where to go, would give him money for the cocaine, and would pay him for his efforts.

At trial, Burgess was the only witness for the defense. He admitted that he was a drug dealer. He testified that he was not an addict and that he was in the drug business for profit. He claimed that he was merely a street dealer and not an organizer, manager, financier or supervisor. His testimony was contradictory, evasive and incredible. Defense counsel admitted in his summation that the State may be able to prove Burgess guilty of being "a leader."

In sum, the evidence manifestly established that Burgess was a drug kingpin. Burgess was not merely a "high-echelon" or an "upper-level" leader in this drug distribution network, he was the leader, the drug kingpin.

## II

A defendant applying for post-conviction relief (PCR) is barred from asserting a ground for relief not previously asserted unless: "(a) ... the ground ... could not reasonably have been raised in any prior proceeding; or (b) ... enforcement of the bar would result in fundamental injustice; or (c) ... denial of relief would be contrary to the Constitution of the United States or the State of New Jersey." See R. 3:22-4.

Thus, absent a constitutional violation or "exceptional circumstances" showing a fundamental injustice, a defendant may not prevail on a PCR application if, as here, the claimed error could have been raised either at trial or on direct appeal. See R. 3:22-4; State v. Mitchell, 126 N.J. 565, 583, 601 A.2d 198 (1992); State v. Cerbo, 78 N.J. 595, 605, 397 A.2d 671 (1979).

The reason for this prohibition is "firmly founded in the efficient and fair administration of justice." *State v. Mitchell, supra,* 126 *N.J.* at 583, 601 *A.*2d 198.

As stated in *Mitchell:*

[t]he State has a strong interest in achieving finality. Without procedural rules requiring the consolidation of issues, litigation would continue indefinitely in a disconnected and piecemeal fashion. Each time a petitioner brought forward a new issue, attorneys and courts would waste their limited resources acquainting themselves with all of the complex details necessary to adjudicate it. When the grounds for challenging a conviction are consolidated, that investment need occur only once, and judicial resources can be more efficiently used to decide cases in a timely fashion. Moreover, relevant issues in a case are often interrelated. Adjudicating them separately would impair a court's ability to reach a result that fairly synthesizes all of the relevant factors into a just and reasoned outcome.

[126 *N.J.* at 584, 601 *A.*2d 198.]

Attempting to evade the bar of the rule by "[c]loaking the claim in constitutional language will not guarantee relief. A court must scrutinize the assertion to ascertain whether constitutional rights are truly at stake." *Id.* at 586, 601 *A.*2d 198.

The record in this case discloses no denial of defendant's constitutional rights nor any fundamental injustice. Accordingly, defendant's PCR application was properly denied. *See R.* 3:22-4. Even if the rule does not bar defendant's belated raising of this claim, I would deny the claim on the merits. *See infra.*

## III

An announcement of a new rule of criminal law or procedure can wreak havoc in the administration of criminal justice if applied to convictions which were tried and affirmed under the old rule. As stated by Justice Proctor for a unanimous court in *State v. Johnson,* 43 *N.J.* 572, 206 *A.*2d 737 (1965):

[s]ociety reasonably expects that when a man is convicted of a crime by a method not considered unfair according to the rules of law then in effect, that conviction will stand. Therefore, unless some countervailing considerations of "the deepest sentiments of justice" compel otherwise, a new rule of criminal law should not be applied retroactively.

[*Id.* at 584, 206 *A.*2d 737.]

The United States Supreme Court in *Teague v. Lane*, 489 *U.S.* 288, 109 *S.Ct.* 1060, 103 *L.Ed.*2d 334 (1989), cogently described the perils of using the doctrine of retroactivity to vacate criminal convictions. The Court said that:

> [a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect. The fact that life and liberty are at stake in criminal prosecutions "shows only that 'conventional notions of finality' should not have as *much* place in criminal as in civil litigation, not that they should have *none.*" "[I]f a criminal judgment is ever to be final, the notion of legality must at some point include the assignment of final competence to determine legality."
>
> [*Id.* at 309, 109 *S.Ct.* at 1074–75, 103 *L.Ed.*2d at 355 (citations omitted).]

The Court agreed with Justice Harlan's observation that:

> No one, not criminal defendants, not the judicial system, not society as a whole is benefitted by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation.
>
> [*Id.* at 309, 109 *S.Ct.* at 1075, 103 *L.Ed.*2d at 355 (quoting *Mackey v. United States*, 401 *U.S.* 667, 691, 91 *S.Ct.* 1160, 1171, 1179, 28 *L.Ed.*2d 404, 419 (1971) (Harlan, J., concurring in part and dissenting in part)).]

The Court pointed out that these principles become even more critical when retroactivity is used to set aside criminal convictions in which direct review has been exhausted.

> The "costs imposed upon the State[s] by retroactive application of new rules of constitutional law in *habeas corpus* ... generally far outweigh the benefits of this application." In many ways the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions for it *continually* forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards.
>
> [*Teague, supra*, 489 *U.S.* at 309, 109 *S.Ct.* at 1075, 103 *L.Ed.*2d at 355 (citations omitted).]

New Jersey has faithfully followed these precepts. Former Chief Justice Wilentz stated in *State v. Biegenwald*, 106 *N.J.* 13, 524 *A.*2d 130 (1987), that:

> [t]he unfairness, if there be any, in not applying the laws retroactively in these cases [when the criminal law changes for the benefit of the defendants] is balanced by the needs of the practical administration of justice; the system cannot continual-

ly retry, reevaluate, or resentence all those convicted under prior laws every time that law is changed.

[*Id.* at 66, 524 *A.*2d 130.]

These principles have had enduring vitality in New Jersey jurisprudence. Research has not disclosed any reported appellate decision in New Jersey, except the majority opinion in this case, in which a new rule of law has been applied to overturn convictions which have become final. No persuasive reason has been advanced why the new rule announced by a divided Court in *Alexander* is a gale of such force and magnitude that it blows away virtually all prior convictions.

## IV

The majority concludes that *Alexander* did not announce a "new rule of law" and therefore may be given complete retroactive effect. This conclusion cannot withstand careful analysis.

Whether a decision is a new rule of law for the purpose of retroactivity analysis was recently discussed at length by the Supreme Court in *State v. Knight*, 145 *N.J.* 233, 678 *A.*2d 642 (1996); *see also State v. Abronski*, 145 *N.J.* 265, 678 *A.*2d 659 (1996). At issue in *Knight* was whether *State v. Sanchez*, 129 *N.J.* 261, 609 *A.*2d 400 (1992), should be given retroactive effect. In *Sanchez*, the Court had held that the mere recitation of *Miranda* warnings did not provide an indicted defendant with sufficient information to make a knowing and intelligent waiver of the right to counsel. 129 *N.J.* at 279, 609 *A.*2d 400.

The Court held in *Knight* that *Sanchez* was a new rule of law and therefore its retroactive effect could be limited. 145 *N.J.* at 258, 678 *A.*2d 642. A five Justice majority in *Knight* limited the *Sanchez* rule to defendants who had not exhausted direct review of their convictions. *Ibid.* Two Justices would deny any retroactivity to *Sanchez*. *Id.* at 262, 609 *A.*2d 400.

In *Abronski, supra*, the Court held that its decision in *State v. Reed*, 133 *N.J.* 237, 261–62, 627 *A.*2d 630 (1993) (police must

inform a suspect in custody that an attorney wishes to communicate with the suspect), was a new rule of law and should not be applied retroactively. 145 *N.J.* at 267–68, 678 *A.*2d 659.

In *Knight,* the Court said:

In *State v. Lark,* we discouraged undue emphasis on the old rule/new rule distinction, and noted our reluctance to decide retroactivity questions on the basis of the now-discredited common-law view of law as "perpetual and immutable." In *Lark,* we cited approvingly the federal Supreme Court's broad definition of "new rule" that provides that a " 'case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government ... [or] if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.' " Moreover, we held that a decision involving an "accepted legal principle" announces a new rule for retroactivity purposes so long as the decision's application of that general principle is "sufficiently novel and unanticipated."

[*State v. Knight, supra,* 145 *N.J.* at 250–51, 678 *A.*2d 642 (citations omitted).]

Applying the above criteria here, the *Alexander* decision, like the *Sanchez* and *Reed* decisions, was a "new rule" for retroactivity purposes. *Alexander* represented a major and drastic change in the construction and application of the drug kingpin statute. The decision broke "new ground," it was not "dictated" by existing precedent, and its application was "novel and unanticipated." Consequently, *Alexander* is subject to retroactivity analysis.

V

When a decision sets forth a "new rule," three factors are generally considered to determine whether the rule is to be applied retroactively: (1) the purpose of the new rule and whether it would furthered by retroactive application; (2) the reliance placed on the old rule by those charged with administering it; and (3) the effect the retroactive application would have on the administration of justice. *State v. Knight, supra,* 145 *N.J.* at 251, 678 *A.*2d 642.

If a decision is to be given retroactive effect, then the court must determine whether it is given only "pipeline" retroactivity, applying only to cases still on direct appeal, or "complete" retroac-

tivity, applying to all cases including those like Burgess in which all avenues of direct appeal have been exhausted.

The majority in this case gives *Alexander* essentially complete retroactive effect. In *State v. Burstein*, 85 *N.J.* 394, 427 *A.*2d 525 (1981), the Supreme Court said that complete retroactive effect is a drastic result and therefore limited to cases:

> where the purpose of the new rule "is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function" and which raises "serious questions about the accuracy of guilty verdicts in past trials." In such cases the new rule is given complete retroactive effect, regardless of how much the State justifiably relied on the old rule or how much the administration of justice is burdened. *Because this is such a drastic result, it has usually been applied only to those cases where the old rule "substantially" impaired the reliability of the truth-finding process.*
>
> [*Id.* at 406–07, 427 *A.*2d 525 (emphasis added) (citations omitted).]

Even in cases dealing with the "ultimate fairness and soundness" of the jury's verdict, complete retroactivity has not been given. *See State v. Czachor*, 82 *N.J.* 392, 408–09, 413 *A.*2d 593 (1980) (giving only limited retroactivity to the rule prohibiting the coercive *Allen* charge).

Similarly, under federal retroactivity principles, complete retroactivity is given "only in rare circumstances" to cases in which direct review has been exhausted. *State v. Knight, supra,* 145 *N.J.* at 253, 678 *A.*2d 642. The majority finds in this case such a "rare circumstance," namely, that the failure to give the *Alexander* charge was a violation of those procedures that are "implicit in the concept of ordered liberty." *See supra* at 264, 689 *A.*2d at 735. It is difficult to understand how the failure to give a charge which the three dissenting Justices in *Alexander* found to be unnecessary is a violation of procedures that are "implicit in the concept of ordered liberty."

Moreover, in *Teague, supra,* the United States Supreme Court made it clear that the failure to follow such procedures "must implicate the fundamental fairness of the trial." 489 *U.S.* at 312, 109 *S.Ct.* at 1076, 103 *L.Ed.*2d at 357. The Court said that the new procedures to be found "implicit in the concept of ordered liberty" must be limited in scope "to those new procedures without

which the likelihood of an accurate conviction is seriously diminished." *Id.* at 313, 109 *S.Ct.* at 1077, 103 *L.Ed.*2d at 358. In *Teague,* the Court found that the rule in *Batson v. Kentucky,* 476 *U.S.* 79, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69 (1986) (prosecutor cannot exercise preemptory challenges in order to excuse venirepersons from the petit jury on account of their race), should not be given complete retroactivity. The Court said that *Batson's* requirement is "a far cry from the kind of absolute prerequisite to fundamental fairness that is 'implicit in the concept of ordered liberty.' " *Id.* at 314, 109 *S.Ct.* at 1077, 103 *L.Ed.*2d at 358.

Similarly, in this case the new model charge of the drug kingpin statute, considered unnecessary by three Justices of the Supreme Court, *see State v. Alexander, supra,* 136 *N.J.* at 580–81, 643 *A.*2d 996 (Clifford, J. dissenting), is a "far cry" indeed from a rule of criminal procedure which is an "absolute prerequisite to fundamental fairness" and thereby "implicit in the concept of ordered liberty."

Moreover, this is not a case in which the old rule substantially impaired the reliability of the truth finding process, or which raises "serious questions" about the accuracy of the verdict. *Burstein, supra,* 85 *N.J.* at 406, 427 *A.*2d 525. On the contrary, the evidence of guilt was ample, strong and compelling. *See supra* Part I.

Moreover, the difference between the old and new charge was not significant in the context of this case. Basically, there are two differences between the two charges. First, under the new charge, the State must prove that the defendant occupied a high-level position in the conspiracy, although not necessarily the highest level. Here the evidence clearly established that Burgess occupied *the* highest level in the conspiracy. He was *the* drug kingpin. Thus, it would have made no difference whichever charge was given.

The second change is that the words "organizer, supervisor, financier and manager" are explained to the jury as follows:

An organizer is a person who arranges, devises or plans a drug trafficking conspiracy. A supervisor is one who oversees the operation of a drug trafficking conspiracy. A financier is one who is responsible for providing the funds or resources necessary to operate a drug trafficking conspiracy. A manager is one who directs the operations of a drug trafficking conspiracy.

[*Model Jury Charges*, Leader of a Drug Trafficking Network, *N.J.S.A.* 2C:35–3 (1996); *see also State v. Alexander, supra*, 136 *N.J.* at 575, 643 *A.*2d 996 (requiring this language).]

The State must prove only that the defendant falls into one of these four categories. *See N.J.S.A.* 2C:35–3. Moreover, the defendant need not be the only or even the primary organizer, supervisor, financier or manager. *Model Jury Charges*, Leader of a Drug Trafficking Network, *N.J.S.A.* 2C:35–3 (1996). Here, the proofs plainly place Burgess within each of these four categories. *See supra* Part I. He was *the* organizer, *the* supervisor, *the* financier and *the* manager—*the* drug kingpin—of this major street level drug trafficking operation.

Thus, the use of the old rule neither "substantially" impaired the truth finding process in this case nor brought into "serious question" the accuracy of the verdict. *See State v. Burstein, supra*, 85 *N.J.* at 406, 427 *A.*2d 525. Further, the new rule is clearly not an "absolute prerequisite to fundamental fairness" that is "implicit in the concept of ordered liberty." *See Teague, supra*, 489 *U.S.* at 313, 109 *S.Ct.* at 1077, 103 *L.Ed.*2d at 358. Consequently, *Alexander* should not be retroactively applied to this case.

## VI

The majority concludes that the charge in *Burgess* constituted plain error whether or not *Alexander* is regarded as having announced a new rule of law for the purposes of retroactivity analysis. Plain error is error not previously raised which is "clearly capable of producing an unjust result." *R.* 1:7–5. The "plain error" found by the majority here was apparently not "plain" to the trial judge and defense counsel or to the Appellate Division panel which affirmed Burgess's conviction and life sentence. Moreover, the majority in *Alexander* did not expressly

state that the failure to give the charge in that case was "plain error." The three Justices in the minority stated that "surely" it was not plain error. *State v. Alexander, supra,* 136 *N.J.* at 581, 643 *A.2d* 996 (Clifford, J., dissenting).

Furthermore, in *Afanador* the new charge was not given; however, the majority of the Supreme Court upheld Afanador's conviction even though the evidence was "equivocal." *See* 134 *N.J.* at 178, 631 *A.2d* 946. The majority in *Afanador* took no position on the "propriety" of the trial court's charge. *Ibid.* Nonetheless, if the failure to give the new charge constituted plain error, i.e., "error clearly capable of producing an unjust result," a reasonable assumption is that Afanador's conviction and life sentence would have been overturned then and there.

Moreover, whether a failure to give a proper charge is plain error depends on the facts of the case. *State v. Jordan,* 147 *N.J.* 409, 425–26, 688 *A.2d* 97 (1997) (failure to give a *Hampton* charge is not plain error unless the omission is clearly capable of producing an unjust result); *State v. Medina,* 147 *N.J.* 43, 54, 685 *A.2d* 1242 (1996) (an erroneous charge on reasonable doubt did not constitute plain error); *State v. G.S.,* 145 *N.J.* 460, 476, 678 *A.2d* 1092 (1996) (trial court's failure to instruct jury as required by *State v. Stevens,* 115 *N.J.* 289, 309, 558 *A.2d* 833 (1989), was not plain error under the facts of the case); *cf. State v. Hampton,* 61 *N.J.* 250, 294 *A.2d* 23 (1972) (requiring jury to be charged concerning jury's duty to determine credibility of defendant's out-of-court admission).

Under the facts in this case, the failure to give the jury charge required by *Alexander* was not clearly capable of producing an unjust result, *see supra* Part I, and accordingly was not plain error.

## VII

My colleagues conclude that the burden on the criminal justice system of retroactive application of *Alexander* will not be inordinate because the convictions of no more than ten drug kingpins

need be set aside. The majority treats the weight of this burden too lightly. Retrials after substantial lapses in time are often inherently unfair. Witnesses may have died or are unavailable. Time washes away memory. Physical evidence may no longer be available. These factors permeate and taint the search for truth which is the essence of a fair trial.

Additionally, complete retroactivity produces confusing and incongruous results. Consider, for example, the case of *State v. Dozier*, A–5276–92T4 (App.Div.1994). *Dozier* was convicted prior to the *Alexander* decision of being a drug kingpin. On appeal, he argued that he should have been given the new *Alexander* charge. Another panel of the Appellate Division held in an unreported opinion that: (1) the *Alexander* decision should be applied prospectively and not given any retroactive effect; and (2) the failure to give the *Alexander* charge was not plain error.[1] The New Jersey Supreme Court denied certification. *See State v. Dozier*, 142 *N.J.* 454, 663 *A.*2d 1361 (1995).

Presumably, Dozier will now seek a new trial relying on the majority opinion in the present case. His grounds will be those which a panel of the Appellate Division has already squarely considered and unanimously rejected. If the majority opinion in the present case is followed, Dozier's new quest may be successful. This uneven and erratic application of the criminal laws does not enhance public confidence in the due administration of criminal justice.

## VIII

The proper disposition of this case rests on a fundamental and long standing precept of criminal jurisprudence. A conviction of a defendant who is plainly guilty and has received a fair trial should

---

[1] The *Dozier* decision is not being "cited" as precedent, *see R.* 1:36–3. It is mentioned to illustrate the impact which the majority opinion will have on criminal convictions under the drug kingpin statute. *See Falcon v. American Cyanamid*, 221 *N.J.Super.* 252, 261 & n. 2, 534 *A.*2d 403 (App.Div.1987).

not be set aside. *See Snyder v. Massachusetts,* 291 *U.S.* 97, 122, 54 *S.Ct.* 330, 338, 78 *L.Ed.* 674, 687 (1933) (Cardozo, J.) ("There is danger that the criminal law will be brought into contempt ... if gossamer possibilities of prejudice ... set the guilty free."); *United States v. Liss,* 137 *F.*2d 995, 999 (2nd Cir.1943) (Hand, J.) (if we "clutch at shadows" in order to reverse criminal convictions, then the effective enforcement of criminal law will be impossible).

As eloquently stated by Judge Friendly in his classic article, *Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments:*

> Legal history has many instances where a remedy initially serving a felt need has expanded bit by bit, without much thought being given to any single step, until it has assumed an aspect so different from its origin as to demand reappraisal—agonizing or not.  That, in my view, is what has happened with respect to collateral attack on criminal convictions.  After trial, conviction, sentence, appeal, affirmance, and denial of certiorari by the Supreme Court, in proceedings where the defendant had the assistance of counsel at every step, the criminal process, in Winston Churchill's phrase, has not reached the end, or even the beginning of the end, but only the end of the beginning....  My thesis is that, with a few important exceptions, convictions should be subject to collateral attack only when the prisoner supplements his constitutional plea with a colorable claim of innocence.
>
> [Henry J. Friendly, *Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments,* 38 *U. Chi L.Rev.* 142, 142 (1970).]

I find no substance in the defendant's other contentions. *See R.* 2:11–3(e)(2).  I would affirm the well-merited conviction of the defendant as a drug kingpin.