873 A.2d 534

CUMBERLAND MUTUAL FIRE INSURANCE COMPANY, PLAIN-
TIFF-APPELLANT, v. TIMOTHY MURPHY, III, TIMOTHY
MURPHY, JR. SANDRA MURPHY, GINA M. SANTIAGO AND
FERDINAND SANTIAGO, DEFENDANTS-RESPONDENTS.

Argued February 15, 2005—Decided May 23, 2005.

*Frank G. Basile,* argued the cause for appellant (*Basile &
Testa,* attorneys; *Mr. Basile* and *Renee E. Scrocca,* on the brief).

*J. Davy Yockey,* argued the cause for respondents Gina M.
Santiago and Ferdinand Santiago (*Flager & Yockey,* attorneys;
*Michael S. Levin,* on the letter in lieu of brief).

*J. Michael Farrell,* argued the cause for respondents Timothy
Murphy, III, Timothy Murphy, Jr., and Sandra Murphy (*Wilentz,
Goldman & Spitzer,* attorneys).

PER CURIAM.

The members of the Court being equally divided, the judgment
of the Appellate Division is affirmed.

Justice LONG, concurring.

This case involves the actions of a fourteen-year-old boy who
foolishly shot some BBs to "ding" passing vehicles. As a result,
the driver of one of the vehicles sustained an injury. The boy's
·parents sought coverage under their homeowner's policy. Al-
though all parties agree that there is no direct evidence that the
boy subjectively intended or expected to cause an injury, the
insurer declined coverage on the basis of two exclusionary clauses
in its policy. We are here called upon to determine the meaning
of those clauses.

## I.

The facts established during discovery are as follows. On January 20, 2001, fourteen-year-old Timothy Murphy, III, and his thirteen-year-old friend Eric Kovalchek, visited the home of fifteen-year-old Eric Elder. At around 11:00 p.m., the boys decided to shoot BBs at passing cars. They retrieved a BB gun from the Elders' shed, and climbed onto a ten-foot high wooden platform in a tree at the edge of the Elders' property, twenty-five yards from the road. The night was dark and moonless, and it was sleeting. Visibility was poor.

According to Murphy, he and Elder took turns firing. By listening to the sound of the BBs ricocheting off the vehicles, Murphy estimated that he hit four or five of them. Kovalchek did not remember Elder hitting any cars, though he did recall Murphy hitting two or three, including a Jeep. By all accounts, Kovalchek did not shoot the BB gun.

Murphy admitted to shooting intentionally at the cars, but he denied that he intended to hurt anyone and claimed that he did not understand at the time that someone could get hurt. When asked why he thought that shooting BBs at moving cars would not cause injury, Murphy responded, "Because I never thought that it would hit a person, I was just seeing like to get it to hit the car. I never thought it would go inside of them." Murphy also conceded that, at the time, he knew that what he was doing was "wrong," "illegal," and might subject him to "juvenile court." Despite understanding those risks, Murphy thought at the time that he was just "hav[ing] fun with [his] friends." He acknowledged that the boys talked "a little bit" during their time on the platform, but he could not remember what they had discussed.

For the most part, Elder and Kovalchek confirmed Murphy's version. Elder testified that he never thought that they could hurt anyone and that "it seemed harmless at the time." Elder also stated that nothing was said on the platform that indicated that any of the boys expected or feared that someone would be hurt. Kovalchek said that he told the others, "I don't feel like this is the

right thing, I don't think we should be doing this," but, when asked whether Elder or Murphy said or did anything that gave him the idea that they wanted to harm someone, Kovalchek answered, "No, not at all." Further, Kovalchek indicated that no one expressed concern that the BBs could penetrate one of the cars.

At some point that night, Gina Santiago drove her soft-top Jeep along the road in front of the Elders' property. Her husband, Ferdinand, was a passenger in the vehicle. A BB, shot from the platform, struck the Jeep, pierced its plastic window, and entered Mrs. Santiago's right eye. She was permanently blinded in that eye, an injury that leaves her susceptible to further complications.

Elder stated that the boys decided to end the shooting when Santiago's vehicle stopped and the driver got out because they "thought it could have been teenagers like coming back to like find us or something like that...." Kovalchek confirmed that a Jeep stopped on the road after being hit by a BB, which Murphy had fired, and that a passenger got out of the Jeep, walked around it and got back in, and that the Jeep drove off. Murphy denied that the boys were aware that a vehicle had stopped, and he could not recall the precise reason why they had ceased shooting. The boys returned to the Elders' house, where they spent the night.

After an investigation, the State filed a delinquency petition against Murphy alleging facts that, if committed by an adult, would have constituted possession of a firearm for an unlawful purpose and aggravated assault. Murphy admitted to aggravated assault with a civil reservation that prevented use of his admission in any future proceeding. The judge adjudicated Murphy delinquent and imposed two years of probation. Murphy was also required to pay fines, take a gun-safety course, and participate in community service.

In January 2002, based on diversity jurisdiction, the Santiagos sued Murphy and his parents (collectively the Murphy family) in the United States District Court for the District of New Jersey. Cumberland Mutual Insurance Co., the Murphy family's home-

owner's insurance carrier, then began this declaratory action in Superior Court, naming Murphy, the Murphy family, and the Santiagos as defendants. Cumberland sought a declaration that it was not obliged to provide coverage to the Murphy family for the injuries suffered by Mrs. Santiago.

Cumberland based its denial of coverage on exclusions contained in the homeowner's policy. The policy provides coverage for "bodily injury" that is caused by an "occurrence" and, in turn, defines "occurrence" as "an accident ... which results ... in bodily injury." The policy excludes coverage as follows:

SECTION II D · LIABILITY NOT INSURED

We do not provide insurance under Section II for any sort of damages, expenses, liability, or loss directly or indirectly, wholly or partially, aggravated by, consisting of, or resulting from the following

. . . .

4. ENDANGERMENT OR HARM

We do not cover bodily injury or property damage, whether or not expected or intended by the insured, which is a consequence of an insured's willful harm or knowing endangerment.

. . . .

SECTIONS I & II · OTHER LOSS AND LIABILITY NOT INSURED

We provide no insurance for any sort of damages, expenses, liability, or loss directly or indirectly, wholly or partially, aggravated by, consisting of, or resulting from the following.

. . . .

GOVERNMENTAL AND LEGAL ACTION

. . . .

D. Knowing violation of penal law or ordinance committed by, or with the consent of, an insured, statutory fines, or exemplary or punitive damages, illegal transportation or trade.

[(Formatting altered).]

Cumberland and the Santiagos filed cross-motions for summary judgment. The fundamental issue on both motions was whether the policy provisions clearly excluded Murphy's acts from coverage. After a hearing, the trial judge denied Cumberland's motion and granted that of the Santiagos. The judge determined that the material facts—that multiple shots were fired and that Murphy fired the BB that hit Santiago—were not disputed. He concluded,

however, that, contrary to Cumberland's contention, the circumstances surrounding the shooting would not support a presumption that Murphy harbored a subjective intent to injure anyone. Specifically, the judge held, among other things, that Mrs. Santiago's injury was not "an inherently probable and foreseeable consequence" of Murphy's actions, given the weather, the boys' stated intention, their distance from the roadway, the few shots that hit their mark, and the unlikely happenstance of the Santiago's vehicle having a permeable top. He also found that although Murphy and Elder did "something utterly stupid[,]" "this stupid prank was not one in which they envisioned the horrible injury that they caused."

Cumberland appealed. In an unpublished, *per curiam* opinion, the Appellate Division affirmed. We granted Cumberland's petition for certification, *Cumberland v. Murphy,* 182 *N.J.* 139, 861 *A.*2d 844 (2004) and now affirm.

## II.

Cumberland argues that the "willful harm" and "knowing endangerment" exclusion preludes coverage for injuries caused by an insured's intentional acts; that in ruling in favor of coverage, the courts below misapplied our prior case law regarding intentional acts; that Murphy's intent can be presumed based on the "objective circumstances" surrounding his "particularly reprehensible" conduct; and that, in any event, the penal law exclusion in the policy precludes coverage. The Murphys counter that Mrs. Santiago's injury was plainly contemplated by their homeowner's insurance policy, that the boys' actions were not intentional acts subjecting them to the policy's exclusion, and that the fatally ambiguous "willful harm" or "knowing endangerment" exclusions must be construed in favor of coverage.

## III.

We have carefully reviewed this record in light of the claims advanced by Cumberland and have concluded that our interven-

tion is unwarranted. As Cumberland concedes, the outcome in this case depends on the application of our prior decisions in *Voorhees v. Preferred Mutual Insurance Co.,* 128 *N.J.* 165, 607 *A.*2d 1255 (1992), *SL Industries Inc. v. American Motorists Insurance Co.,* 128 *N.J.* 188, 607 *A.*2d 1266 (1992), and *Harleysville Insurance Companies v. Garitta,* 170 *N.J.* 223, 785 *A.*2d 913 (2001).

In *Voorhees,* we recognized that the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury. 128 *N.J.* at 183, 607 *A.*2d 1255. Thus, a "covered accident" includes the unintended consequences of an intentional act, but not an injury that is, itself, intended. *Id.* at 182, 607 *A.*2d 1255. Foolhardy or reckless acts are not automatically excluded from coverage. *Id.* at 184, 607 *A.*2d 1255. However, if the acts are particularly reprehensible (for example, sexual abuse of children in a day care center), subjective intent can be presumed from the likelihood that injury will result from that reprehensible conduct. *Ibid.*

In *SL Industries,* we considered the additional questions "whether *any* intent to injure will render the resulting injury intentional, whether the wrongdoer must intend the *specific* injury that results, or whether there is some middle ground between the two approaches." 128 *N.J.* at 209, 607 *A.*2d 1266. We held that coverage is generally excluded if the insured "subjectively intends or expects to cause *some sort of injury.*" *Id.* at 212, 607 *A.*2d 1266 (emphasis added). However, if the insured's conduct causes a degree of injury that is "improbable," then the court must determine "whether the insured subjectively intended or expected to cause *that injury.*" *Ibid.* (emphasis added). Without the intent to cause "that injury," the injury will be deemed "accidental," and the insurance company will be obligated to provide coverage.

We reaffirmed the holdings in *Voorhees* and *SL Industries* in *Garitta:*

As a general rule, then, policy exclusions of the type at issue here represent enforceable limitations to an insurance contract when free of ambiguity. Courts

ordinarily should refrain from summary judgment in respect of whether an insured intended or expected to cause the actual injury to a third party unless the record undisputedly demonstrates that such injury was an inherently probable consequence of the insured's conduct. In that latter circumstance, a trial may not be necessary to determine the applicability of the exclusion, provided that there has been a sufficient demonstration of the insured's subjective intent to cause some degree of injury. When the insured's conduct is particularly reprehensible, courts may presume an intent to injure without inquiring into the actor's actual intent. [*Garitta, supra,* 170 *N.J.* at 234–35, 785 *A.2d* 913.]

Applying those principles, we are satisfied, as were the trial judge and the Appellate Division, that what occurred in this case was an "accident" within the meaning of the Cumberland policy. The uncontroverted evidence given by Murphy, Elder and Koval-chek provides no basis for the conclusion that they subjectively intended or expected to injure anyone. Neither, in light of the weather, the distance of the boys from the road and the few shots that hit their target, can we say that Mrs. Santiago's injury was an inherently probable consequence of Murphy's conduct. Nor do we agree with Cumberland that the heedless conduct of that fourteen-year-old boy was in any way equivalent to the acts we have previously characterized as "particularly reprehensible," so as to give rise to a presumption of an intent to injure Mrs. Santiago.

We likewise question our dissenting colleagues' postulate that the "willful harm" and "knowing endangerment" exclusion was meant to eliminate from consideration the notions of "expected or intended" injury and the jurisprudence surrounding them. Indeed we think it would be fair to say that "expected" is an analogue of "knowing endangerment," and "intended" of "willful harm."

But even if our colleagues are correct in their determination that the willful harm and knowing endangerment exclusion was fashioned to eliminate our prior "expected or intended" jurisprudence, the result would be the same. The insurer, as the drafter of an insurance policy, is responsible for its language. Where that language is ambiguous, its object is determined not by what the insurer intended it to mean, but by what a reasonable person in the position of the insured would have understood it to mean at

the time the contract was entered into. 2 *Couch on Insurance* 3d § 21.14. An insured's reasonable expectation of coverage depends, in turn, on the plain meaning of the policy language. *Ibid.* "[W]hen the terms of an insurance contract are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties." *Kampf v. Franklin Life Ins. Co.*, 33 *N.J.* 36, 43, 161 *A.*2d 717 (1960).

> However, when a policy is unclear ambiguities ordinarily are resolved in favor of the insured. We have observed that where the policy language of an insurance policy supports two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied.
>
> [*Progressive Cas. Ins. Co. v. Hurley,* 166 *N.J.* 260, 273–74, 765 *A.*2d 195 (2001) (internal citations and quotations omitted).]

With that teaching in mind, we have reviewed the language of the exclusion in Section II(D)(4) and have concluded that it is impossible to divine its boundaries insofar as it simultaneously does not require an injury to be "expected or intended," but does require it to flow out of "willful harm" or "knowing endangerment." Those terms, which are undefined in the policy, elsewhere have been recognized as imprecise. *Cumberland Mutual Fire Insurance v. Beeby,* 327 *N.J.Super.* 394, 402–03, 743 *A.*2d 853 (App.Div.2000). Indeed, our dissenting colleagues concede that the words are subject to numerous interpretations. To us, that leaves open the issue of whether the improbable consequences of Murphy's childish conduct fall within the exclusion. At the very least, a reasonable insured, who read the policy, might have expected that they would not. Thus, under our well-established principles of insurance policy interpretation, the policy must be interpreted in favor of coverage. *Lundy v. Aetna Cas. and Sur. Co.,* 92 *N.J.* 550, 559, 458 *A.*2d 106 (1983).

## IV.

We are likewise unpersuaded by Cumberland's reliance on the penal law exclusion in the policy. Our Legislature, aided by our case law, has created vastly different systems to address adult and juvenile crime, in recognition of the fundamental differences in

culpability as between a child and an adult. Because of that recognition and because the exclusion at issue here does not define a violation of the penal law, it can arguably be read as referencing only an adult's violation of a criminal statute, and not conduct by a juvenile that, if committed by an adult, would constitute a crime. Even if debatable, the penal law exclusion is ambiguous and must be interpreted in favor of coverage. *Progressive, supra,* 166 *N.J.* at 273–74, 765 *A.*2d 195.

V.

We would affirm the judgment of the Appellate Division.

Chief Justice PORITZ and Justice ZAZZALI join in the opinion.

Justice WALLACE, dissenting.

I respectfully dissent.

Just as the concurring opinion does, I agree that the outcome of this case depends on the application of our prior decisions in *Voorhees, supra; S.L. Industries, supra,* and *Garitta, supra.*

Before addressing the central issue, I note several well established principles underlying my decision. An insurance policy is a contract. *President v. Jenkins,* 180 *N.J.* 550, 562, 853 *A.*2d 247 (2004). "When interpreting an insurance policy, courts should give the policy's words 'their plain, ordinary meaning.'" *Ibid.* (quotation omitted). "If the policy terms are clear," the policy should be interpreted as written. *Ibid.* But, "[w]hen an insurance policy's language fairly supports two meanings, one that favors the insurer, and the other that favors the insured, the policy should be construed to sustain coverage." *Id.* at 563, 853 *A.*2d 247 (citation omitted). Although exclusions in an insurance policy should be narrowly construed, if the exclusion is "specific, plain, clear, prominent, and not contrary to public policy[,]" it should be given effect. *Doto v. Russo,* 140 *N.J.* 544, 559, 659 *A.*2d 1371 (1995). To be sure, "the burden is [up]on the insurer to bring the case within

the exclusion." *Princeton Ins. Co. v. Chunmuang,* 151 *N.J.* 80, 95, 698 *A.*2d 9 (1997).

With those tenets in mind, I now apply them to the principles articulated in the *Voorhees*; *S.L. Industries,* and *Garitta* decisions. In *Voorhees* and *S.L. Industries,* which were decided the same day, we addressed the insurance company's duty to defend. In *Voorhees,* the insured was sued by her child's teacher for her comments concerning the teacher's competency and fitness. *Supra,* 128 *N.J.* at 169, 607 *A.*2d 1255. The insured had a homeowner's insurance policy from Preferred Mutual Insurance Company that provided coverage for bodily injury caused by an "*occurrence,*" defined as an accident, and excluded coverage for "liability ... caused intentionally." *Id.* at 171, 607 *A.*2d 1255. The insurer refused to defend in part based on the intentional acts exclusion. *Ibid.* Because the policy provided coverage for "occurrences" that were accidental, we assessed whether the court must find a "subjective intent to injure" or whether the court could "presume an intent to injure from the objective circumstances." *Id.* at 184, 607 *A.*2d 1255. We held that "[a]bsent exceptional circumstances that objectively establish the insured's intent to injure, we will look to the insured's subjective intent to determine intent to injure." *Id.* at 185, 607 *A.*2d 1255. We expressly noted that "[w]hen the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure." *Id.* at 184, 607 *A.*2d 1255. We explained that the "objective approach focuses on the likelihood that an injury will result from an actor's behavior rather than on the [actor's] subjective state of mind." *Ibid.*

In *S.L. Industries,* we considered "whether *any* intent to injure will render the resulting injury intentional, whether the wrongdoer must intend the *specific* injury that results, or whether there is some middle ground between the two approaches." *Supra,* 128 *N.J.* at 209, 607 *A.*2d 1266. We adopted a middle ground approach and concluded that coverage is generally excluded if the insured "subjectively intends or expects to cause *some sort of*

*injury.*" *Id.* at 212, 607 *A.2d* 1266 (emphasis added). However, if the insured's conduct causes an injury that is "improbable," then the court must determine "whether the insured subjectively intended or expected to cause that injury." *Ibid.* We concluded that without the intent to cause that injury, the injury will be deemed "accidental," and the insurance company will be obligated to provide coverage. *Ibid.*

In *Garitta,* we applied the principles of *Voorhees* and *S.L. Industries* to deny coverage. *Supra,* 170 *N.J.* at 241–42, 785 *A.2d* 913. The insured in that case was a teenager who was challenged to a fight. *Id.* at 226, 785 *A.2d* 913. Although the insured contended that he tried to avoid the fight, he ultimately concluded that he had no choice but to confront the challenger. *Id.* at 227, 785 *A.2d* 913. A friend gave the insured a kitchen knife that he placed in his back pocket. *Ibid.* When the challenger approached, the insured stabbed the victim twice with the knife, critically wounding him. *Id.* at 228, 785 *A.2d* 913. The insured's policy excluded coverage for "bodily injury [w]hich is expected or intended by the insured[.]" *Id.* at 230, 785 *A.2d* 913 (internal quotations omitted). We held that the undisputed facts demonstrated that the insured "intended to cause some injury, and that the actual injury [ ] led to [the challenger's] death was an inherently probable consequence of the insured's action." *Id.* at 235, 785 *A.2d* 913.

In the present case, the policy contains the following exclusionary provision:

[Cumberland does] not cover bodily injury or property damage, whether or not expected or intended by the insured, which is a consequence of an insured's willful harm or knowing endangerment.

Fairly read, the exclusion prohibits coverage for bodily injury or property damage from the insured's "willful harm" or "knowing endangerment" regardless of whether the insured "expected or intended" the precise injury or property damage that occurred. The plain reading of the phrase "whether or not expected or intended by the insured" eliminates the need for an inquiry into the insured's subjective intent that we found necessary in *Voorhees* and *S.L. Industries.* The policies in *Voorhees* and *S.L.*

*Industries* lacked a phrase similar to the one in Cumberland's policy. In my opinion, the Cumberland policy eliminates the subjective prong of the test and requires us to focus on whether the insured's conduct demonstrated "willful harm" or "knowing endangerment."

Unfortunately, those terms are not defined in the policy. In that event, we look to their ordinary meaning. *President, supra,* 180 *N.J.* at 566, 853 *A.*2d 247. "Willful" is defined as "[p]roceeding from a conscious motion of the will; voluntary; knowingly; deliberate." *Black's Law Dictionary* 1599 (6th ed. 1970). Another entry of *Black's Law Dictionary* defines "willful" as "[i]ntending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary." *Ibid.* Still another entry defines the term as "[p]remiditated; malicious; done with evil intent, or with a bad motive or purpose, or with indifference to the natural consequences." *Ibid.* The dictionary notes that "[i]t is a word of many meanings, with its construction often influenced by its context." *Ibid.* That same dictionary defines "harm" as "[t]he existence of loss or detriment in fact of any kind to a person resulting from any cause." *Id.* at 718. Based on those definitions, "willful harm" could mean "detriment of any kind resulting from any voluntary cause," or "a loss not accidentally or involuntarily caused." *But see Cumberland Mut. Fire Ins. Co. v. Beeby,* 327 *N.J.Super.* 394, 402, 743 *A.*2d 853 (2000) (noting that "precise definition of 'willful harm' has proven to be elusive").

"Knowing endangerment" is similarly susceptible to multiple definitions. *Black's Law Dictionary* defines "knowingly" as "[w]ith knowledge; consciously; intelligently; willfully; intentionally." *Id.* at 872. Hence, "knowing" can mean both "conscious" and "intentional." Moreover, the definition includes the term "willfully," an obvious overlap with "willful harm." The term "endangerment" is defined as "the act of placing in danger or the state of being placed in danger." *Webster's Third New International Dictionary* 748 (1971). Thus, the ordinary meaning of

"knowing endangerment" could be "consciously placing someone or something in a state of danger."

Without question, the Cumberland policy should have defined those terms to avoid any ambiguity. Despite that shortcoming, the insured's conduct plainly falls within any reasonable definition of "willful harm" or "knowing endangerment." The insured admitted that he intended to shoot his BB gun in the hope of hitting the passing cars and he knew that discharging a firearm towards a person could result in injury or property damage. It cannot be disputed that it is substantially certain that firing a BB gun at a car from approximately twenty-five yards away would result in some injury to the occupant or damage to the vehicle. The insured consciously and intentionally put the vehicle and any occupant in danger. Because the policy language of "whether or not expected or intended by the insured," eliminated the subjective element that the insured must intend the injury, so long as the bodily injury or property damage results from the insured's willful harm or knowing endangerment, the policy exclusion should apply. I conclude that the insurer has demonstrated that the insured's conduct constituted both "willful harm" and "knowing endangerment."

I am satisfied that the various definitions for "willful harm" and "knowing endangerment," coupled with the qualifier—"whether or not expected or intended by the insurer"—demonstrate that the exclusionary provision was intended to be broad. At this time, I see no need to define the outer limits of those terms to conclude that the policy exclusion in this case was intended to apply to the insured's conduct of firing of a BB gun at passing cars. Whatever the precise meaning of the terms "willful harm" and "knowing endangerment," the insured's conduct met those definitions for the exclusionary provision of the policy to apply.

The concurring opinion cites *Progressive Casualty Insurance Co., supra,* 166 *N.J.* at 273, 765 *A.*2d 195, for the principle that when policy language "supports two meanings, one favorable to the insurer and the other to the insured, the interpretation

favoring coverage should be applied." I agree with that proposition. Here, however, the insured's conduct would fall within whatever definition he would give to "willful harm" or "knowing endangerment." Simply put, because the explicit language of the exclusion eliminates the need to determine whether the insured intended or expected the particular injury or property damage, the policy plainly was intended to exclude coverage. Stated differently, I am satisfied that regardless of the existence of any ambiguity in the policy, the insured had no reasonable expectations of coverage.

Viewing the evidence in the light most favorable to the insured, I conclude that the insured's conduct was excluded from coverage under the Cumberland insurance policy.

I would reverse.

Justices LaVECCHIA and RIVERA–SOTO join in this opinion.

Justice RIVERA–SOTO, dissenting.

I cannot agree with the Appellate Division's holding that is upheld today by an evenly divided Court. To the extent this Court concludes that insurance coverage is not excluded under the endangerment or harm exclusion of the insurance policy-providing that "[w]e do not cover *bodily injury* or *property damage,* whether or not expected or intended by the *insured,* which is a consequence of an *insured's* willful harm or knowing endangerment"—I join in the thoughtful dissent of my colleague Justice Wallace.

There is yet another exclusion in the insurance policy that bars, in my view, the relief afforded. The insurance policy clearly and unambiguously provides that

[*w*]e provide no insurance for any sort of damages, expenses, liability, or loss directly or indirectly, wholly or partially, aggravated by, consisting of, or resulting from the following—even if loss or an *occurrence* otherwise covered contributes to such *concurrently or in any sequence.*

GOVERNMENTAL AND LEGAL ACTION

D.   Knowing violation of penal law or ordinance committed by, or with the consent of, an *insured,* statutory fines, or exemplary or punitive damages, illegal transportation or trade.

The policy defines "occurrence" as "an accident (including exposure to conditions) which results, during the policy term, in *bodily injury* or *property damage*." The policy also defines "insured" to include, among others, the named insured, the named insured's spouse, and any relatives resident in the named insured's household.

The senseless events of the late evening of January 20, 2001—during which the 14-year-old son of the named insured, intentionally and with the knowledge that he was engaging in an illegal act, took random potshots with a BB gun at a number of passing cars during a snow storm, the last shot piercing the soft top of the Jeep driven by the victim, rendering her blind in her right eye—are a textbook example of the very behavior excluded from coverage by this exemption. There was an event producing bodily injury (an "occurrence") that resulted from the actions of a resident relative of the named insured (an "insured") that constituted a knowing violation of the penal laws of this State. Therefore, on its face, the behavior for which insurance coverage is sought is clearly excluded.

The Court discards the insurance policy's exclusion for acts that violate "penal law" because that exclusion, which does not define penal law, "can arguably be read as references only an adult's violation of a criminal statute, and not conduct by a juvenile that, if committed by an adult, would constitute a crime" and "[e]ven if debatable, the penal law exclusion is ambiguous and must be interpreted in favor of coverage." *Ante,* 183 *N.J.* at 352, 873 *A.*2d at 539. There is, however, no meaningful or principled distinction between the insurance policy's exclusion for acts that knowingly violate the penal laws of this State and the actor's status as a juvenile. Stated differently, in this setting, whether the actor is an adult or a juvenile is a distinction without a difference. Our Juvenile Code expressly defines "delinquency" as "the commission of an act by a juvenile which if committed by an adult would

constitute [either] [a] crime; [a] disorderly persons offense or petty disorderly persons offense; or [a] violation of any other penal statute, ordinance or regulation." *N.J.S.A.* 2A:4A–23. The restrictions of the penal laws of this State apply to everyone regardless of age; how we as a society treat those violations based on the actor's age goes not to the actor's substantive liability for a violation of our penal laws, but to the quantum and manner of punishment to be imposed. On the more immediate question of whether insurance coverage is applicable or is excluded by this policy provision, the age of the insured is irrelevant. Given this analysis, any claim of ambiguity cannot be sustained.

The acts performed by the minor resulting in the injuries to the victim clearly violate the penal laws of this State: a BB gun is defined as a "firearm", *N.J.S.A.* 2C:39–1(f), *State v. Mieles,* 199 *N.J.Super.* 29, 488 *A.*2d 235 (App.Div.), *certif. denied,* 101 *N.J.* 265, 501 *A.*2d 933 (1985); *State v. McCandless,* 190 *N.J.Super.* 75, 461 *A.*2d 1205 (App.Div.1983); and a factual setting where a minor knowingly discharges a firearm at a single moving vehicle, not to mention the several motor vehicles this minor shot at and hit before firing the shot that blinded the victim here, violates a number of our criminal laws. *See, e.g., N.J.S.A.* 2C:12–1 (assault); *N.J.S.A.* 2C:58–6.1 (possession of firearms by minors); *N.J.S.A.* 2C:12–5 (unlawful possession of weapons). This conclusion is buttressed by the minor's admissions that he took a number of potshots at moving vehicles with the intent of not only shooting at them, but also of actually hitting them; that, when he shot at them, he knew that these vehicles were occupied, at least by a driver and possibly some passengers; that he knew that what he was doing was wrong; that he knew that what he was doing was illegal; that he knew that if he were caught shooting his BB gun at passing vehicles he would be prosecuted; and that he anticipated that he would be questioned by the police after the incident.

If the policy exclusion that excludes coverage for acts which violate penal law does not apply in these circumstances, then it is needlessly denied its full meaning, a conclusion the Court, by its

evenly divided status, reaches and to which I cannot subscribe. Furthermore, allowing insurance coverage under these circumstances is not just bad law, it is bad public policy. In general, the Court holds that an insurance company would still be civilly liable for wrongful death when its under-aged insured criminally murders another. · In specific, the Court's ruling, without any support in the record or in the plain meaning of the insurance policy, concludes that the policy's penal law exclusion, which does not define penal law, "can arguably be read as references only an adult's violation of a criminal statute, and not conduct by a juvenile that, if committed by an adult, would constitute a crime." *Ante,* 183 *N.J.* at 352, 873 *A.*2d at 539. The plain statement of that conclusion belies its illogic, a result underscored by the facts underlying our recent denial of certification to a criminal defendant convicted of firing a BB gun into his backyard bushes for the purpose of scaring away teenage pranksters on Mischief Night[1] and striking one of the teenagers in the leg, causing no injury greater than a small bruise. *State v. Mott,* 183 *N.J.* 257, 872 *A.*2d 798 (2005).[2] That criminal defendant was sentenced to five years imprisonment for the second-degree offense of possession of a firearm with a purpose to use it unlawfully against the person or property of another, in violation of *N.J.S.A.* 2C:39–4(a), with a three year parole disqualifier under the Graves Act, *N.J.S.A.* 2C:43–6(c). An orderly system of justice cannot, on the basis of the accidental characteristic of age alone, penalize an adult with five years imprisonment for firing a BB gun intending to scare away harassers that results in a slight bruise to a trespasser and, at the same time, provide insurance coverage to a juvenile who

---

[1] October 30th, the night before Halloween.

[2] *State v. Mott* is cited solely to highlight its factual underpinnings and not for its jurisprudential effect; a denial of certification has neither substantive significance, *Olds v. Donnelly,* 150 *N.J.* 424, 470, 696 *A.*2d 633 (Stein, J., concurring in part and dissenting in part), nor precedential effect. *R.* 1:36–3; *State v. Burgess,* 298 *N.J.Super.* 254, 285 n.1, 689 *A.*2d 730 (App.Div.1997) (Humphreys, J.A.D., dissenting).

fired a BB gun intending to hit his target (passing cars driving in a snow storm occupied by drivers and, perhaps, passengers, who had done nothing to provoke an assault) and rendered an innocent driver blind in one eye.

Because, in addition to the endangerment or harm exclusion, I would also deny coverage based on the exclusion for acts violative of the penal laws of this State, I respectfully dissent.

Justice LaVECCHIA joins in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices LONG and ZAZZALI—3.

*For reversal*—Justices LaVECCHIA, WALLACE and RIVERA–SOTO—3.