1 A.3d 784 (2010)
415 N.J. Super. 237
William J. HAMMER, Plaintiff,
v.
Douglas W. THOMAS and Joshua Thomas, Defendant.
Proformance Insurance Co., Plaintiff-Appellant,
v.
New Jersey Manufacturers Insurance Company and Douglas Thomas, Defendants-Respondents, and
Joshua Thomas, Defendant, and
William Hammer, Defendant-Appellant.
Docket No. A-0209-08T2, A-0742-08T2
Superior Court of New Jersey, Appellate Division.
Argued December 16, 2009.
Decided August 9, 2010.
*785 Aldo J. Russo, Livingston, argued the cause for appellant Proformance Insurance Company (Russo & Della Badia, LLC, attorneys; Mr. Russo, on the brief).
Matthew W. Ritter, Bridgeton, argued the cause for appellant William Hammer (The Ritter Law Office, attorneys; Mr. Ritter, on the briefs).
Robert R. Nicodemo, III, argued the cause for respondent New Jersey Manufacturers Insurance Company (Law Office of Robert R. Nicodemo, III, attorney; Richard V. Cosentino, Haddonfield, on the brief).
Parker, McKay & Criscuolo, attorneys for respondent Douglas Thomas have not filed a brief.
Before Judges AXELRAD, FISHER[1] and ESPINOSA.
The opinion of the court was delivered by
AXELRAD, P.J.A.D.
In this declaratory judgment action, an injured motorist and his uninsured motorist (UM) carrier appeal from summary judgment in favor of the tortfeasor's automobile insurance provider who declined coverage based on the policy exclusion for any insured "[w]ho intentionally causes bodily injury or property damage." We affirm.
On June 10, 2004, William Hammer was severely injured when a vehicle operated by Joshua Thomas ("Thomas") and owned by Douglas Thomas crossed the double-yellow line and struck his car head on, causing both cars to roll and become total losses. The Hammer vehicle was insured by Proformance Insurance Co. ("Proformance") while the Thomas vehicle was insured by New Jersey Manufacturers Insurance Co. ("NJM").
Douglas Thomas' policy with NJM policy obligated the insurer, in pertinent part, to "pay damages for bodily injury or property damage for which any insured becomes *786 legally responsible because of an auto accident [but] ... [w]e have no duty to defend any suit or settle any claim for bodily injury or property damage not covered under this policy." The policy excluded liability coverage for any insured "[w]ho intentionally causes bodily injury or property damage."
On June 3, 2005, Hammer filed a complaint against the Thomases seeking compensation for his injuries and against Proformance for UM benefits. Hammer's request to enter default against Thomas was filed on August 8, 2005, and, according to his brief, default was entered. NJM answered the Hammer complaint on behalf of Douglas Thomas only.
Meanwhile, on June 8, 2005, Proformance filed a declaratory judgment action against NJM, Thomas, Douglas Thomas, and William Hammer. Proformance sought a ruling that NJM had wrongfully disclaimed coverage to the Thomases and was obligated to defend or indemnify its insureds. Hammer and NJM filed answers. On September 9, 2005, the Hammer and Proformance complaints were consolidated.
On February 13, 2007, a consent judgment was entered in favor of Hammer against Thomas for $425,000. This was the amount of the Rule 4:21A-1 arbitration award based on a finding that Thomas was 100% responsible for the accident. With taxed costs and pre-judgment interest, the total judgment was $450,165.74.
In accordance with instructions by the court during a conference on the trial date, NJM and Proformance filed cross-motions for summary judgment with a joint stipulation of facts.[2] Following oral argument on August 15, 2008, summary judgment was entered in favor of NJM.[3] Proformance and Hammer appealed.

I.
Following the accident, Thomas and Hammer were taken to Christiana Hospital. Hammer suffered multiple serious injuries; Thomas suffered a head laceration as a result of hitting the windshield during impact.[4] According to the police report, Thomas told Trooper Doelling he was "angry" after having an argument with his parents about whether or not he was taking his medication; he claimed he was, but his parents believed he was not. He admitted to "driving recklessly" and traveling about sixty-five miles per hour on the county road with a speed limit of fifty miles per hour. Thomas explained that after he viewed a vehicle traveling toward him in the opposite lane, he let go of the steering wheel and his vehicle traveled into the oncoming lane, striking the Hammer vehicle head on. When asked by the trooper why he had let go of the wheel, Thomas responded that he "wanted to hit the other vehicle," and when asked the reason, Thomas said he "wanted to end it all." Accordingly, the trooper classified the accident as an attempted suicide.[5]
*787 Thomas' parents, who were present at the hospital, related that Thomas is a paranoid schizophrenic who was prescribed medications but was displaying symptoms that he was not taking them. They told the trooper that when they confronted him, Thomas went to his vehicle and quickly departed the driveway.
On September 20, 2004, Thomas gave a recorded statement to NJM in which he stated there was poor visibility because it was night and raining, and he crossed the center lane into oncoming traffic and struck another vehicle. When questioned about his responses to the investigating trooper, Thomas first stated he didn't know if he wanted "to hit the other vehicle," and then said he "didn't want to hit it."
With respect to the motions for summary judgment, counsel agreed to the following stipulated facts:
Joshua Thomas:
1. Had an argument with his parents;
2. Was driving recklessly;
3. At about 65 miles per hour;
4. Was angry;
5. Viewed a vehicle traveling toward him in the opposite lane;
6. Let go of the wheel;
7. Joshua told the Trooper that he wanted to end it all;
8. By letting go of the wheel, while traveling at about 65 miles per hour, there was a reasonable likelihood that Joshua would cause property damage.
The court also had as part of the record a February 9, 2007 affidavit by Thomas submitted in connection with Hammer's summary judgment motion, joined in by Proformance (in this context collectively referred to as "appellants"), seeking a finding of fact that Thomas did not intend to harm Hammer. The motion was denied by order of March 16, 2007. Thomas had certified, in part, that:
4. I did not even notice Mr. Hammer's vehicle until just before we collided.
....
6. I suffered serious injuries, in the collision, including a concussion, with loss of consciousness....
....
8. I have no recollection of making the[ ] statements [contained in the police report] and, in fact, no recollection of being questioned, at Christiana Hospital, by a [police officer].
9. I certainly did not tell the State Police that I was trying to kill myself.
10. In conjunction with the above events, I was evaluated by Dr. Elliot L. Atkins, Ed.D., who performed a forensic psychological evaluation of me.[[6]]
....
12. In his [March 28, 2005] Report, Dr. Atkins concludes that any statements that I may have made to the State Police, while hospitalized with a head injury, were inaccurate, and in fact, were in conflict with other accounts of the crash, which were apparently elicited from me that evening.[[7]]

*788 13. Dr. Atkins ultimately concluded that I was not suicidal on the night [of the accident].
....
16. I certainly did not intentionally injure Mr. Hammer. The injuries which he did suffer were the unintended consequences of my careless driving [at the time].
In granting summary judgment to NJM, the judge held that Charles Beseler Co. v. O'Gorman & Young, Inc., 188 N.J. 542, 911 A.2d 47 (2006), relied on by appellants, was inapplicable as it "was really limited to the set of facts in the Workers' Comp[ensation] venue," incorporating his rationale articulated during Hammer's prior unsuccessful summary judgment motion. He found the apparent factual dispute had been removed by the parties' stipulations, specifically, stipulation number eight, which reflected an intention to cause property damage. The judge further noted that, as a practical matter, Thomas knew he would cause more than just property damage and it was more than reasonably likely he would injure or kill himself or someone in the other vehicle, but that such a finding was unnecessary in view of the stipulation that implicated the policy exclusion.

II.
Proformance argues on appeal: (1) there was conflicting evidence as to Thomas' subjective intent to cause injury so that summary judgment was not appropriate; (2) the exclusion should not be enforced because the language is ambiguous as it fails to define "accident" or "intentional," and NJM's interpretation of the policy is inconsistent with the reasonable expectation of the insured; (3) the court should have relied on Beseler, which held in a workers' compensation case that a similar exclusion was ambiguous for failing to exclude acts substantially certain to result in injury, warranting coverage; and (4) Proformance's cross-motion for summary judgment should have been granted.
Hammer argues on appeal: (1) NJM failed to bring this case within the policy exception and meet its burden of establishing that Thomas intentionally caused the bodily injury suffered by Hammer; (2) there should have been no exclusion based on the Beseler rationale; (3) NJM must provide coverage for the unintended consequences of an insured's intentional act, absent an express exclusion; (4) the incident was an "accident" under NJM's policy because Thomas did not intend to harm Hammer; and (5) the court erred in failing to construe NJM's exclusion in favor of coverage because any fair and reasonable interpretation of the policy would so allow. Based on our review of the record and applicable law, we are satisfied summary judgment was appropriate and the court properly concluded as a matter of law that Thomas' conduct fell within the exclusion of NJM's policy.
When reviewing a grant of summary judgment, we employ the same standards used by the motion judge. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App. Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). First, we determine whether the moving party has demonstrated that there were no genuine disputes as to material facts, and then we decide whether the motion judge's application of the law was correct. Atl. Mut. Ins. Co. v. Hillside Bottling Co., Inc., 387 N.J.Super. 224, 230-31, 903 A.2d 513 (App.Div.), certif. denied, 189 N.J. 104, 912 A.2d 1264 (2006). In so doing, we view the evidence in the light most favorable to the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995). We accord no deference to the motion judge's *789 conclusions on issues of law, Manalapan Realty, L.P., v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995), which we review de novo. Dep't of Envtl. Prot. v. Kafil, 395 N.J.Super. 597, 601, 930 A.2d 457 (App.Div.2007).
Our Supreme Court has analyzed intentional acts exclusions under both automobile and homeowners policies and has found them to be valid and consistent with public policy. See Allstate Ins. Co. v. Malec, 104 N.J. 1, 13, 514 A.2d 832 (1986) ("declaring that a specific exclusion, in an automobile liability insurance policy, from coverage for the insured's liability caused by his intentional wrongful acts does not violate either public policy or ... the statutory scheme," particularly where "there are available to the claimant other sources of recovery, such as PIP benefits, UM coverage, and workers' compensation benefits"). See also Harleysville Ins. Co. v. Garitta, 170 N.J. 223, 231, 785 A.2d 913 (2001) (holding that, in the context of homeowners liability policies, "`[p]olicy provisions that exclude coverage resulting from intentional wrongful acts are "common," are "accepted as valid limitations," and are consistent with public policy'" (quoting Malec, supra, 104 N.J. at 6, 514 A.2d 832) (alteration in original)).
NJM's insuring agreement requires it to pay damages for bodily injury or property damage for which its insured becomes legally responsible because of an automobile accident. The term "accident" is used here as a term of art ("automobile accident") because it is a personal auto policy. If this were the only provision in the policy, NJM could not disclaim coverage because Hammer's claim is for bodily injury and its insured's legal responsibility clearly results from an automobile accident. However, the insuring agreement expressly disclaims a defense or settlement of any bodily injury or property damage claim not covered under the policy, expressly excluding coverage for an insured who "intentionally causes bodily injury or property damage."
Voorhees v. Preferred Mutual Insurance Co., 128 N.J. 165, 607 A.2d 1255 (1992) and SL Industries, Inc. v. American Motorists Insurance Co., 128 N.J. 188, 607 A.2d 1266 (1992) serve as the starting point for analyzing whether conduct alleged to be intentional may, nonetheless, be covered under a liability insurance policy. The Court explained the balancing test implicated in interpreting a policy exclusion for intentional injuries, stating:
The jurisprudence interpreting insurance provisions that implicate the question of the extent of coverage for intentional acts demonstrates a careful balance between competing doctrines. On the one hand, we have long held that public policy denies insurance indemnification for the civil consequence of wrong-doing.... On the other hand, we recognize the desire to compensate victims with insurance proceeds to the extent that that compensation will not condone and encourage intentionally-wrongful conduct.
[Voorhees, supra, 128 N.J. at 180-81, 607 A.2d 1255 (internal citations omitted).]
In Voorhees the homeowners policy provided coverage to an insurer legally liable because of bodily injury caused by an "occurrence," defined as an "accident," but excluded coverage for "liability ... caused intentionally." Id. at 171, 607 A.2d 1255. The Court stated that its inquiry "parallel[ed] that taken in interpreting policy exclusions for intentional acts [which] preclude coverage for injuries expected or intended by the insured." Id. at 184, 607 A.2d 1255. The Court focused on the injuries resulting from the act and held:

*790 [T]he accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury. If not, then the resulting injury is `accidental,' even if the act that caused the injury was intentional. That interpretation prevents those who intentionally cause harm from unjustly benefit[ ]ing from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing. It also accords with an insured's objectively-reasonable expectation of coverage for unintentionally-caused harm.
[Id. at 183, 607 A.2d 1255 (emphasis added).]
The Court elaborated that "[a]bsent exceptional circumstances that objectively establish the insured's intent to injure," involving acts that are particularly reprehensible, such as sexual abuse of children in a day care center, "we will look to the insured's subjective intent to determine intent to injure." Id. at 185, 607 A.2d 1255. Thus, actions that appear foolhardy or reckless are not automatically excluded from coverage but require an inquiry into the actor's subjective intent to cause injury. Id. at 184, 607 A.2d 1255; see also Cumberland Mut. Fire Ins. Co. v. Murphy, 183 N.J. 344, 349, 873 A.2d 534 (2005).
In SL Industries, supra, the insured's general liability and comprehensive catastrophic liability policies provided coverage for injuries caused by an "occurrence" defined as an "accident ... which results in bodily [or personal] injury ... neither expected nor intended from the standpoint of the insured." 128 N.J. at 194, 607 A.2d 1266. The Court enunciated the principle that once it is established the wrongdoer "subjectively intends or expects to cause some sort of injury, that intent will generally preclude coverage," unless "there is evidence that the extent of the injuries was improbable," in which case a court "must inquire as to whether the insured subjectively intended or expected to cause that injury." Id. at 212, 607 A.2d 1266 (emphasis added); see also Cumberland Mut., supra, 183 N.J. at 349, 873 A.2d 534. Lacking the intent to cause the "improbable" injury, the injury will be deemed accidental and coverage must be provided. SL Indus., supra, 128 N.J. at 212, 607 A.2d 1266.
In Garitta, supra, the homeowners policy similarly provided liability coverage for bodily injury caused by an occurrence for which the insured was responsible, defined in terms of an accident resulting in bodily injury, with an exclusion for bodily injury "[w]hich is expected or intended by the insured." 170 N.J. at 230, 785 A.2d 913 (alteration in original). The Court reaffirmed the Voorhees and SL Industries holdings, stating:
Courts ordinarily should refrain from summary judgment in respect of whether an insured intended or expected to cause the actual injury to a third party unless the record undisputedly demonstrates that such injury was an inherently probable circumstance of the insured's conduct. In that latter circumstance, a trial may not be necessary to determine the applicability of the exclusion, provided that there has been sufficient demonstration of the insured's subjective intent to cause some degree of injury. When the insured's conduct is particularly reprehensible, courts may presume an intent to injure without inquiring into the actor's actual intent.
[Id. at 234-35, 785 A.2d 913.]
In Garitta, the undisputed facts indicated that the insured was called out to a fight, exited the house with a knife hidden *791 in the back of his pants and met the victim, who was unarmed. Id. at 235, 785 A.2d 913. Right before the encounter, his friend had urged him to cut the victim. Ibid. Without warning, the insured thrust the knife into the victim's bare torso twice, resulting in the victim's death. Ibid. The Court accepted as true the insured's repeated testimony following the incident that he did not intend to cause the victim's death, but found that testimony "[did] not alter the reality that the insured affirmatively stabbed [the victim] with a knife, an inherently dangerous object, given to him by [a friend] for the purpose of cutting or harming the victim." Id. at 239, 785 A.2d 913. Because the Court was satisfied the mortal injury inflicted on the victim was "an inherently probable consequence of the insured's actions," the Court was able to find, as a matter of law, the insured's intent for purposes of the exclusion, and concluded on summary judgment that the insured's conduct fell within the policy's provision excluding coverage. Id. at 241-42, 785 A.2d 913.
In Cumberland Mutual, supra, the insured's homeowners policy similarly provided coverage for bodily injury caused by an occurrence, defined as an accident resulting in bodily injury, and contained an exclusion providing the insurer would not cover bodily injury or property damage, "whether or not expected or intended by the insured, which is a consequence of an insured's willful harm or knowing endangerment." 183 N.J. at 347, 873 A.2d 534. The undisputed facts were that the fourteen-year-old insured and two other juveniles shot BBs from a platform twenty-five yards from the roadway on a night with poor visibility with the intention of "dinging" passing cars, the insured estimated he hit four or five vehicles based on the sound of the BBs ricocheting off them, one of his shots then went through the soft top of the victim's jeep and struck her, permanently blinding her in one eye. Id. at 345-46, 873 A.2d 534. The insured admitted to intentionally shooting at the cars, but denied he intended to hurt anyone. At the time, he also claimed he did not understand someone could get hurt and nothing was said indicating that any of the boys expected or feared that anyone would be hurt. Id. at 345, 873 A.2d 534. The Court, equally divided, relying on the principles articulated in the above cited cases, affirmed the grant of summary judgment to the insured on cross-motions seeking a determination whether the policy provisions clearly excluded the insured's acts from coverage, concluding that what occurred in the case was an "accident" within the meaning of the policy. Id. at 347-51, 873 A.2d 534. The Court was satisfied the circumstances surrounding the shooting provided no basis for concluding the juveniles subjectively intended or expected to injure anyone. Id. at 350, 873 A.2d 534. Nor was the victim's injury "an inherently probable consequence" of the insured's conduct, in light of the weather, the boys' stated intention, their distance from the road, the few shots that hit their mark and the "unlikely happenstance of the [victim's] vehicle having a permeable top." Id. at 348, 350, 873 A.2d 534. Moreover, the Court did not find the "heedless conduct" of the juvenile equivalent to the acts characterized as "particularly reprehensible" so as to give rise to a presumption of intent to injure the victim. Id. at 350, 873 A.2d 534.
In order to withstand summary judgment, NJM must demonstrate there is no genuine issue that Thomas' conduct falls within the policy exclusion, namely, that he intentionally caused bodily injury or property damage. R. 4:46-2(c); see also Proformance Ins. Co. v. Jones, 185 N.J. 406, 415, 887 A.2d 146 (2005) (holding that "policy exclusions must be narrowly construed; [and] the burden is on the insurer *792 to bring the case within the exclusion[ ]" (citation and quotation marks omitted)). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c).
We must therefore analyze NJM's policy exclusion and the facts surrounding the motor vehicle accident, with all favorable inferences to appellants, under the balancing test and principles enunciated in the Voorhees line of cases. Appellants argue that the fact the NJM does not include "intended or expected" precludes the application of the Voorhees line of cases and renders the exclusion ambiguous, thus mandating coverage. We reject those arguments. Even in Voorhees, where the exclusion did not contain the "expected or intended" language, the Court analyzed the exclusion as if the language were there. Voorhees, supra, 128 N.J. at 183, 184, 607 A.2d 1255. The same analysis is applicable to NJM's exclusion of coverage for an insured who "intentionally causes bodily injury or property damage." "Intentionally causes" is not an ambiguous phrase. Appellants have failed to show that the language of NJM's exclusion would fairly support more than one meaning and, therefore, we apply the plain language of the policy. See Villa v. Short, 195 N.J. 15, 23, 947 A.2d 1217 (2008).
Thus, we begin our inquiry with whether "the record undisputedly demonstrates [Hammer's] injury was an inherently probable consequence of [Thomas'] conduct." Garitta, supra, 170 N.J. at 234, 785 A.2d 913. In this case it is undisputed that Thomas was speeding and he let go of the wheel after seeing Hammer's vehicle approaching in the opposite direction. Hammer's injury was an "inherently probable consequence" of Thomas' conduct. Since this prong was clearly met, summary judgment is appropriate if "there has been a sufficient demonstration of [Thomas'] subjective intent to cause some degree of injury." Ibid.
We are not convinced that the trial court's interpretation of stipulation number eight as reflecting Thomas' intention to cause property damage ends the inquiry in NJM's favor. The coverage and exclusion language of the NJM policy contains parallel references to "bodily injury or property damage." We thus interpret the exclusion to apply to the respective bodily injury or property damage claim if there is an intention to cause that component.
Our conclusion is based, in part, on the Court's rationale in Cumberland Mutual, supra, which contained the following exclusion: "We do not cover bodily injury or property damage, whether or not expected or intended by the insured, which is a consequence of an insured's willful harm or knowing endangerment." 183 N.J. at 347, 873 A.2d 534 (emphasis added). In that case there was clear intent by the juvenile insured to cause property damage. The Court, however, did not discuss or conclude that the insured's intent to cause property damage precluded coverage to the insured for personal injury.[8]
We reject NJM's argument that Thomas' conduct was equivalent to the acts the Court has characterized as "particularly reprehensible," so as to give rise to a presumption of an intent to injure Hammer without inquiring into Thomas' actual intent. We are satisfied, however, that the *793 record, giving all favorable inferences to appellants, does sufficiently demonstrate Thomas' subjective intent to cause some degree of injury. The record consists of the police investigation report prepared immediately following the motor vehicle accident on June 10, 2004, Thomas' September 20, 2004 recorded statement to NJM, Thomas' February 9, 2007 affidavit, Dr. Atkins' March 28, 2005 report, and the parties' summary judgment stipulations.
We first consider Thomas' affidavit and Dr. Atkins' report. First of all, Thomas' statement that he "did not even notice Hammer's vehicle until just before we collided" must be read with stipulations number five and six that "Thomas viewed a vehicle traveling toward him in the opposite lane" and "let go of the wheel," clearly demonstrating that Thomas observed Hammer's vehicle in the oncoming lane before he made the decision to let go of his steering wheel, causing his vehicle to ram into Hammer's. Secondly, Thomas' statements that he did not recollect being questioned at the hospital and "certainly did not tell the State Police that [he] was trying to kill [him]self" is non-evidential in view of the stipulation number seven that he "told the trooper that he wanted to end it all."
Thirdly, the three statements made by Thomas at the hospital as reported by Dr. Atkins (he "went out speeding and cracked up the car in a suicide attempt," "crashed car intentionally to affect his parents," and "argued with his parents about medication and then went out speeding and then got involved in an accident") are not inconsistent with one another or with the statements made to Trooper Doelling as reflected in his investigative report. Being killed as a result of "cracking up" or "crashing his car" would definitely "affect" his parents. Moreover, Thomas did become involved in a "motor vehicle accident," which as previously explained, is a term of art.
In addition, Dr. Atkins' diagnosis of "schizophrenia, paranoid type," and his conclusion that Thomas "was not suicidal at the time of his accident" and his actions could have been the result "of one of his many efforts to flee in the face of his perception that he was facing possible psychiatric commitment" or, as in the past, "an attention getting device," do not raise a material issue of fact as to Hammer's subjective intention or expectation to injure Hammer by his actions. Even if Thomas did not intend to kill himself by letting go of the wheel, the record reflects that he did intend to crash his car into Hammer's. We find unpersuasive the distinction drawn by appellants that Thomas' "let[ting] go" of the wheel while speeding and in the face of oncoming traffic in the opposite lane, was not the same as steering his car directly into Hammer's.
Lastly, Thomas' concluding statement in his affidavit that he "did not intentionally injure [ ] Hammer" and that Hammer's "injuries ... were the unintended consequences of [his] careless driving" was the first time Thomas ever stated that he had no intention to injure Hammer. These statements are self-serving bare assertions contained in an affidavit submitted in connection with a summary judgment motion and framed in legal language. Under the circumstances of this case, these statements fail to create a genuine issue of fact.[9]
*794 Thomas got into his car and angrily sped on a public road, and because he was attempting suicide or injury to himself to affect his parents, he let go of the steering wheel only after viewing a car traveling toward him in the opposite lane and crashed into it. He further stipulated that under all the circumstances, there was a "reasonable likelihood" he would cause property damage. However, it is compelling in the record that Thomas' intent was not so limited. By letting go of the wheel only after he saw the oncoming car, as opposed to driving off the road at any time before, Thomas clearly manifested an intention to injure the other motorist in the car. NJM has sufficiently demonstrated that Thomas harbored a subjective intent to cause some injury and that Hammer's injury was an inherently probable consequence of Thomas' conduct. Therefore, summary judgment was appropriate because no further factual inquiry was necessary to resolve the issue as a matter of law as to whether Thomas's actions fell within NJM's policy provision excluding coverage for "any insured [w]ho intentionally causes bodily injury."

III.
We reject appellants' argument that the trial judge erred in not applying the standard and analysis articulated by the Court in Beseler, supra, involving a similarly worded exclusion for "bodily injury intentionally caused or aggravated by [the employer]" contained in the liability portion of an employer's Workers' Compensation and Employers Liability Insurance Policy. 188 N.J. at 545, 911 A.2d 47. Beseler involved a work-related accident whereby the employee had eight fingers amputated while using a large press brake machine on which the employer allegedly removed certain safety guards and warnings. Id. at 544, 911 A.2d 47. The employee filed a workers' compensation claim, as well as a common-law claim against his employer based on the contention the employer committed an intentional wrong so as to avoid the exclusive remedy bar of the Workers' Compensation Act. Ibid.; see also N.J.S.A. 34:15-8 (providing a narrow exception permitting a common-law action for a work-related incident based on an "intentional wrong"). The insured employer sought a declaratory judgment against its liability carrier that the carrier owed a duty to defend and indemnify the employer against the employee's claim that the employer had created a "substantial certainty of injury." Beseler, supra, 188 N.J. at 545, 911 A.2d 47.
The Court first noted the case involved a specialized area of law pertaining to the application of the "intentionally caused" exclusion in a standard Workers' Compensation and Employers Liability Insurance Policy to an employer's claim for coverage against an employee's common-law action, stating:
In this matter we deal with an exception to an insurance policy written in the specialized area of workers' compensation coverage and related employer liability for an employee's common-law cause of action for bodily injuries. The latter category of actions are not easily pursued.
[Id. at 546, 911 A.2d 47.]
In discussing the exclusion in the liability portion of the policy and whether it would apply to the facts of the case, the Court only cited New Jersey case law discussing the workers' compensation system and the public policy behind the statutory exception that permits an employee to seek both workers' compensation and common-law remedies, as well as case law from other jurisdictions involving work-related accidents that was in accord with its decision. Id. at 546, 548-49, 911 A.2d *795 47. The Court discussed the evolution of the "intentional wrong" test, citing the landmark workers' compensation case of Laidlow v. Hariton Machinery Co., Inc., 170 N.J. 602, 613, 790 A.2d 884 (2002), which clarified that an intentional wrong under N.J.S.A. 34:15-8 included "`actions taken with a subjective desire to harm' as well as `instances where an employer knows that the consequences of those acts are substantially certain to result in such harm.'" Beseler, supra, 188 N.J. at 546-47, 911 A.2d 47.
The Court then compared the insured's policy exclusion to the expanded definition of intentional wrong under the statute, and concluded the policy language (excluding claims of "bodily injury intentionally caused") excluded only injuries that result from a subjective intent to injure and not those injuries where an employer knows that the consequences of its acts are substantially certain to result in such harm. Id. at 547-48, 911 A.2d 47.[10] Because the policy did not contain express language excluding injuries falling under the "substantially certain" prong of the intentional wrong exception, the Court found the policy's exclusion to be ambiguous and construed it in favor of the insured. Id. at 548, 911 A.2d 47. It reasoned that an employer could reasonably conclude the policy's language was narrower than the statutory "intentional wrong" exception to exclusivity and thus "would not expect that it would be bare of coverage against the allegations in [the employee's] common-law action." Ibid. Accordingly, the Court ordered the carrier to provide coverage for its insured. Id. at 547, 911 A.2d 47.
Appellants argued to the trial court that the NJM policy Douglas Thomas purchased contains the same exclusion considered ambiguous by the Court in Beseler ("intentionally causes bodily injury or property damage"). They urged that because the policy does not specifically exclude acts substantially certain to result in injury, the court should apply the "unintended consequence" standard of Beseler and hold the exclusion does not apply to unintended injuries resulting from intentional acts. See id. at 545, 547, 911 A.2d 47. Appellants contended no reasonable trier of fact could conclude Thomas intended to injure Hammer and, even if he intended to cause bodily injury to himself, the injuries to Hammer were simply an unintended consequence. Accordingly, appellants argued NJM should be required to provide coverage. They acknowledge on appeal that Beseler was concerned primarily with workers' compensation but urge us, as a matter of first impression, to extend its holding to automobile insurance exclusions.
We are not persuaded by appellants' argument. In the present matter, the trial court correctly found the Beseler decision to be clearly restricted to the workers' compensation setting and inapplicable to case law dealing with exclusions for intentional acts contained in automobile insurance or homeowners policies. In Beseler, the Court compared the language of the employer's insurance policy exclusion with a specific standard applicable solely to workers' compensation law, namely the "intentional wrong" exception to exclusivity contained in N.J.S.A. 34:15-8. Notably, the Court did not cite either Cumberland Mutual, decided only the year before, or any of the litany of cases involving the intentional acts exclusions (Voorhees, SL *796 Industries and Garitta, discussed in Cumberland Mutual). The omission of these authorities from the Court's analysis makes it clear that the Court did not intend to engraft that standard on other than workers' compensation cases and require automobile or homeowners insurance exclusions to contain express language excluding acts "substantially certain" to result in injury in order to be enforced. Moreover, Beseler's holding has not been applied to any of these types of cases in the three and a half years since it was decided.[11]
As no evidence has been presented demonstrating the NJM policy did not meet the reasonable expectations of its insured, the argument presented by Proformance does not warrant any discussion in this opinion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] Judge Fisher did not participate in oral argument. However, the parties consented to his participation in the decision.
[2] Hammer filed opposition to NJM's motion.
[3] By order of August 25, 2008, the court severed the Hammer complaint against Thomas from Proformance's declaratory judgment action, and stayed the Hammer complaint pending the present appeal.
[4] The police investigation report states that Trooper Doelling spoke with Thomas' treating nurse who said he suffered from a laceration to his head and results of the CT scan were negative. Thomas states in his February 9, 2007 affidavit that he suffered a concussion; however, he did not provide any supporting medical records. None of Thomas' medical records are included in the appellate appendix.
[5] Thomas was subsequently indicted on charges of aggravated assault and assault by auto.
[6] Dr. Atkins' report was submitted by Hammer in support of his motion. It appears from the record the evaluation was performed pursuant to court order in the criminal action to determine Thomas' competency to stand trial and related issues.
[7] According to Dr. Atkins, the Christiana records provide three totally different accounts of the events: (1) Thomas "went out speeding and cracked up the car in a suicide attempt"; (2) Thomas "crashed car intentionally to affect his parents"; and (3) Thomas "argued with his parents about medication and then went out speeding and then got involved in an accident."
[8] SL Industries v. American Motorists Insurance Co., 248 N.J.Super. 458, 461, 591 A.2d 677 (App.Div.1991), is the only case of the other three that references "property damage" in the policy. None of the three cases, however, involve property damage issues.
[9] We further note Thomas' claim that he lost consciousness and suffered a concussion is not substantiated by reference to any medical records. Dr. Atkins references Thomas' "post-head injury delirium and confusion, but we are unable to ascertain from the record what he relied on.
[10] The Appellate Division decision affirmed in Beseler characterized the policy language as excluding "`injuries intentionally caused, and not the type of act alleged in this casean unintended injury caused by an intentional wrong.'" Beseler, supra, 188 N.J. at 545, 911 A.2d 47.
[11] Pizzullo v. New Jersey Manufacturers Insurance Co., 196 N.J. 251, 952 A.2d 1077 (2008), an automobile insurance case and Micheletti v. State Health Benefits Commission, 389 N.J.Super. 510, 913 A.2d 842 (App.Div.2007), a health benefits case, do cite Beseler but only for the general principles relating to interpreting insurance contracts, i.e., ambiguity and reasonable expectation of insureds.